**Bobby Jack HOWARD, Appellant,**

v.

**UNITED STATES of America**
**Appellee.**

**No. 15665.**

United States Court of Appeals
Fifth Circuit.

Feb. 2, 1956.

Judgment Vacated on Rehearing
April 20, 1956.

W. V. Dunnam, Jr., Waco, Tex., for appellant.

Lonny F. Zwiener, Asst. U. S. Atty., Austin, Tex., Russell B. Wine, U. S. Atty., San Antonio, Tex., for appellee.

Before HOLMES, RIVES and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

The question presented by this appeal is whether the Court below correctly charged the jury in connection with the plea of insanity which was the only defense appellant sought to support in the Court below. Bobby Jack Howard was convicted under an indictment charging him with the robbery of the Farmers State Bank of Meridian, Texas, by putting the life of a person in jeopardy through the use of a dangerous weapon in violation of 18 U.S.C.A. § 2113(d), and was sentenced to serve twenty-five years imprisonment.

He offered no evidence tending to controvert the Government's evidence as to the commission of the crime, and that evidence clearly supports the verdict of the jury establishing that, on January 31, 1955, Howard, using a pistol pointed at the cashier, a woman, robbed said bank, fleeing with more than $3,000.00 taken from the cash drawer.

His appeal raises a number of questions but the only one meriting discussion is that above stated. The evidence offered on behalf of appellant to sustain his alleged insanity was meager and unconvincing and hardly amounts to more than a scintilla.

The only witness introduced by appellant was his mother who testified that, when appellant was about nine years of age, he had measels which "settled in his head", causing him to become an epileptic. Following the seizures incident to that malady appellant was said to suffer severe headaches producing an abnormal state of mind which lasted one or two days. The only abnormality specified by her manifested itself by a display of irritability instead of his normally kindly

disposition. When asked categorically whether during the period following these seizures she formed any opinion "as to whether or not he was of sound or unsound mind at that time", she replied, "Well, not too much so * * *." He had been away from home about twelve years and she had seen him less than a dozen times during that period.

She testified that, on the morning preceding that of the robbery, appellant did not get up to breakfast when she called him, stating that he was sick. He moved from his own bed into hers because she had guests and she observed that his eyes were "all bloodshot, and I knew that he had had one of them seizures when I looked at him". He remained in bed until about one o'clock and took medicine for a severe headache. During the afternoon he sat around holding his head and indicating that he was in considerable pain. About eight o'clock that night he got in the car and drove off. His actions are unaccounted for from then until the time of the robbery a little after one P.M. the following day.

Appellant's only other evidence consisted of a stipulation dictated into the record in which it was agreed that he had enlisted in the United States Army in October, 1942 and had been granted a medical discharge the following year for epilepsy. He had enlisted in the Air Force in February, 1946 and had been discharged in August, 1947, "for severe chronic anti-social personality". In 1949 shrapnel was removed from his forehead and side, this having been produced by an accidental explosion of a hand grenade. On two different occasions in the past appellant had slashed his own wrists, and appellant was agreed to have epilepsy grand mal. No contention is made that the accidental explosion resulting in the shrapnel in his forehead and side had any connection with the supposed insanity and no details were given as to the two incidents when appellant slashed his own wrists.

The Government presented only one witness in rebuttal, a doctor who was a "member or diplomate on the American Board of Psychiatry and Neurology", who had, under Court order, examined appellant on March 7, 1955. The examination consisted of a "psychiatric examination, neurological examination, physical examination", and also examination with the aid of an electro-encephalograph which was described as a "brain wave". This last examination was for the purpose of determining whether any brain damage had resulted from appellant's epilepsy, and the results were negative. The specialist testified that the chief abnormality he found in appellant was that he presented anti-social type of personality. It was his opinion that, at the time of the examination and at the time of the robbery, appellant had the ability to distinguish right from wrong and to adhere to the right. From his examination and from the history given by appellant, the specialist "concluded that he had not been insane in the past". He further explained that epilepsy grand mal manifested itself by violent seizures during which the patient would be unconscious and subject to convulsions; when the seizure was at an end, the patient would be left weak and depleted but not insane; a very small percentage of epileptics were insane.

■ There was no proof at all that, at the time of the robbery, appellant was not in full possession of his mental faculties or that he was incapable of having a criminal intent or of distinguishing between right and wrong. These are the ultimate tests by which a determination is reached as to whether a defendant is responsible for his criminal acts.

Appellant's attorney dictated seven pages of exceptions to the Court's charge embracing twenty specifications of alleged error. More than half of these were devoted to the Court's charge on the defense of insanity. The chief attack made upon that feature of the Court's charge centered around the contention that the Court used the conjunctive, and, instead of the disjunctive, or,

in presenting to the jury what it should find as a predicate for acquittal.[1]

The excerpts from the charge set forth in the margin are portions of about three pages of the record which the Court devoted to this defense. It is not perceived that the quoted portions of the charge erroneously state the rule because it is made clear that the ultimate fact to be determined was whether the appellant had sufficient mental capacity to form a criminal intent. That basic question is usually resolved by deciding whether the mental capacity was such that the one charged with crime was able to distinguish between right and wrong and to adhere to the right. The closing sentence of this portion of the charge accurately presented the question: "The test of responsibility, where insanity is asserted, is the capacity to distinguish between right and wrong with respect to the act." No case is brought to our attention which tends to condemn the language set forth in the marginal quotation.

It is further clear that this language was entirely proper when fitted into the charge as a whole. The Court went to great lengths to spell out accurately what the jury must find with respect to the insanity plea and to place the burden upon the Government to prove beyond a reasonable doubt that appellant had at the time mental capacity sufficient to form a criminal intent. It is, of course, elementary that the charge as a whole is looked to in deciding whether it correctly states the law. Spring Co. v. Edgar, 1878, 99 U.S. 645, 25 L.Ed. 487; Patterson v. United States, 5 Cir., 1951, 192 F.2d 631. This pertinent language was used by us in the latter case, at page 633:

"As to the claimed errors in the charge, we are convinced that, except perhaps from the strained and hypercritical point of view once obtaining in the review of criminal cases but now no longer possible in the federal courts, the action of the trial court, in giving and refusing charges, was unexceptionable. We are convinced, too, from the consideration of the charge as a whole, rather than from a view alone of isolated portions of it, that appellant was afforded a fair trial with full opportunity to defend himself, including the opportunity of presenting and urging his defenses."

We stand under like conviction here. The record depicts an aggravated crime calling for severe punishment and appellant was given full opportunity to develop his defense of insanity. His case was handled by a court-appointed attorney with unusual earnestness, skill and intelligence. The jury had the whole situation before it and was accurately instructed as to the legal principles which should guide its deliberations. Its verdict and the sentence imposed by the Court are justified and we do not feel constrained to disturb them. The judgment appealed from is

Affirmed.

RIVES, Circuit Judge (dissenting).

The sufficiency of the evidence to require submission to the jury of the issue of insanity was primarily for the trial judge. Both he and the jury had the advantage of seeing and observing the defendant, which this Court lacks. As bearing on the issue of insanity, the trial judge and the jury could take into consideration not only the evidence spe-

1. The following statement taken from the charge of the Court contains the language challenged by appellant:
"But, if you find from the evidence, or have a reasonable doubt in regard thereto, that his brain at the time he committed the act was impaired by disease and the taking of the money was the product of such disease, and that he was incapable of forming a criminal intent, and that he had no control over his mental faculties and the will power to control his actions, but took the money in question while he was laboring under a delusion which absolutely controlled him, and that his act was one of irresistible impulse, and not of judgment, and he did not then know the difference between right and wrong; in that event he would be entitled to your acquittal."

cifically directed to that issue, but also the defendant's appearance and demeanor, and indeed all of the evidence in the case. They had a right to consider that the circumstances of the robbery disclosed an utter lack of sense and no effort whatever at concealment.

The defendant was staying at the house of his uncle, a short distance from Meridian, Texas, in which town the bank was located across the street from the sheriff's office. He borrowed his cousin's 1946 Ford automobile, bearing license tag number DF 7888, which he parked unconcealed in plain view from the window of the bank. The sheriff's wife, the bank cashier, and the bank president, all three, took down the tag number. He entered the bank unmasked at 1:15 P.M. and committed the robbery. He was wearing a grayish tweed sport suit, and when arrested at his uncle's house some six hours later, after he had had ample time to change, he still had on the same clothing. Further, in his right hip pocket at the time of his arrest were folded bills in the amount of $2425.00. The total amount stolen from the bank was $3845.00. In addition to the $2425.00 in the defendant's pocket, a search of his uncle's house disclosed $1160.00, a total of only $60.00 less than the amount stolen.

It was stipulated that the defendant has epilepsy grand mal. He had been twice discharged from the Armed Forces, the first time in 1943 for epilepsy, and again in August of 1947 for "severe chronic antisocial personality." While in the military service, he had been injured by accidental explosion of a hand grenade, and as a sequel to such injury shrapnel was removed from his forehead and side in 1949. The stipulation further disclosed that, "On two different occasions in the past the defendant has slashed his own wrists," though the record is bare of any details or circumstances as to either of those occasions.

In view of the defendant's poverty and his representation by court appointed counsel, it is not surprising that he produced no expert psychiatrist. The opinion testimony of the Veterans' Administration psychiatrist introduced by the Government did not, however, conclude the court and jury.

The defendant's only witness was his mother, whose testimony has been referred to by the majority. According to her, he had had an epileptic seizure the day before the robbery, he suffered from severe headaches for a day or two after such a seizure, remained in an abnormal state of mind, and did not fully understand the nature of his acts. When asked whether during the time before the defendant got in the car and drove off she formed "any opinion as to whether he was of sound or unsound mind at that time," the mother testified:

"A. Well, not too much so, because I just figured that he's going to some of the neighbors and maybe he'd feel better if he could get away from us, you know how mothers are, and I figured I was worrying him going and asking him how he is feeling every few minutes, and I thought he wanted to get somewhere where he could get back together without me hovering around.

"Q. Get himself back together? A. Get over it, you know. And I didn't worry too much about it because I have seen him do it before.

"Q. You have seen him have those after effects? A. Just see him get away from everything.

"Q. The ordinary spells, you say, he'd have after effects; you say it would go along sometimes two days, a day, or two days, and during that day or two afterwards in your opinion does he fully understand the nature of his acts? A. No, no, he doesn't, because I know I'd talk to him and he'd be cross with me and wouldn't want me to—

"Q. Is he himself during that period? A. No, because if he was I could talk to him. He is kind when he is at himself."

In federal courts, the so-called presumption of sanity imposes the burden

at the outset on the defendant to produce "some evidence" of insanity, whereupon the burden of proof remains at all times with the Government to prove beyond a reasonable doubt that the defendant is guilty.

"* * * In a certain sense it may be true that, where the defense is insanity, and where the case made by the prosecution discloses nothing whatever in excuse or extenuation of the crime charged, the accused is bound to produce some evidence that will impair or weaken the force of the legal presumption in favor of sanity. But to hold that such presumption must absolutely control the jury until it is overthrown or impaired by evidence sufficient to establish the fact of insanity beyond all reasonable doubt, or to the reasonable satisfaction of the jury, is in effect to require him to establish his innocence by proving that he is not guilty of the crime charged.

\* \* \* \* \* \*

"Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defense is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question, from the time a plea of not guilty is entered until the return of the verdict, is whether, upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged." Davis v. United States, 160 U.S. 469, 486, 487, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499.

See also, Leland v. State of Oregon, 343 U.S. 790, 797, 72 S.Ct. 1002, 96 L.Ed. 1302; Durham v. United States, 94 U.S. App.D.C. 228, 214 F.2d 862, 866.[1]

The function of the trial court is to determine when the issue of insanity is brought into the case by evidence. It must then properly instruct the jury that if it has a reasonable doubt of the defendant's sanity it must acquit. Davis v. United States, supra; Tatum v. United States, 88 U.S.App.D.C. 386, 190 F.2d 612, 616; Durham v. United States, supra. To require submission of the issue of insanity, the evidence need not appear to the court sufficient even to raise a reasonable doubt of sanity, for evidence of that weight would demand acquittal. It is essential only that the defendant produce "some evidence" of insanity. Authorities supra. As said by this Court in Lee v. United States, 5 Cir., 91 F.2d 326, 330–331:

"While an accused is presumed to be sane, the presumption is rebuttable and only slight evidence to the contrary, admitted in the course of the trial, is sufficient to raise the issue, to be submitted to the jury, with all the other evidence, without shifting the burden of proof."[2]

1. In its treatment of the "presumption of sanity", it is important that the court save the jury from the confusion often incident to "presumption" instructions, Cf. Morissette v. United States, 342 U.S. 246, 275, 72 S.Ct. 240, 96 L.Ed. 288; Wardlaw v. United States, 5 Cir., 203 F.2d 884, 887, note 5; Barfield v. United States, 3 Cir., 229 F.2d 936.

2. In this connection, it may be pertinent to keep in mind the general rule that a judge may not direct a verdict of guilty no matter how conclusive he considers the evidence, but must properly charge the jury on the standards of guilt. United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 408, 409, 67 S.Ct. 775, 91 L.Ed. 973.

Certainly the trial judge, in better position than this Court to pass upon that question, thought that the issue was raised, and instructed the jury at length on the defense of insanity. That the jury, also in better position than this Court, was impressed by the evidence of insanity is demonstrated by what occurred after it retired to consider its verdict.[3]

I have discussed at such length this matter of whether, under the evidence, the trial court was required to submit the issue of sanity to the jury because it seems to me that the Government, in its brief, does not even undertake to justify the trial court's instructions on that issue, but simply argues that the error was harmless.[4]

The majority approves the century old "right and wrong test" of the McNaghten Case, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843), which has heretofore received the approval of this Court,[5] but not of the Supreme Court, and on which Honorable Simon E. Sobeloff has recently commented:

"This test, known familiarly as the 'right and wrong test', turns on a specified and very limited symptom of insanity, which science no longer deems necessarily or even typically associated with most serious mental disorders. Only the drooling idiot can be said to have no knowledge of right and wrong, and he almost never gets into the criminal court. Judging the issue of insanity according to the right-wrong test exclusively is like saying as a matter of law that the only acceptable symptom in defining appendicitis is a pain in the abdomen and that no other diagnostic symptom is valid." 41 A.B.A.J. 793.

In the more than one hundred years which have elapsed since the McNaghten decision, science has made tremendous strides in its understanding of the mysteries of the human brain, and the law, while still laggard, has made some progress as is evidenced by such mile-stone opinions as State v. Pike, 1869, 49 N.H. 399; Parsons v. State, 1886, 81 Ala. 577, 2 So. 854, and Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862. The subject has recently been discussed most ably by Judge Sobeloff in the article to which I have referred, "Insanity and the Criminal Law; From McNaghten to Durham, and Beyond", in the September, 1955, issue of the American Bar Association Journal, Vol. 41, pp. 793 et seq. While the proper test of criminal responsibility is now highly debatable, I agree with the District of Columbia Circuit and with Mr. Sobeloff, that the better rule, more consonant with the developing science of psychiatry, is to ascertain simply, was the defendant suffering from a mental defect or disease which caused him to commit the criminal act?

Even under McNaghten, however, no court, so far as I can find, has ever before placed its stamp of approval on a charge which so confused the burden of proof as did the charge in this case, and which instructed the jury not once, but

---

3. "(A note from the jury was handed to the Court by the Marshal.)

"The Court: They want to know if he will be committed to an institution in the event he is found not guilty. Tell them there is no answer.

"Mr. Dunnam: If the Court please, we request the Court to instruct the jury that the laws of the State of Texas so provide, that upon a man being insane, upon proper legal procedure he can be committed to an institution.

"The Court: That will be refused.

"Mr. Dunnam: Note our exception."

4. "Since it would appear that it was not incumbent upon the court to charge on insanity in view of the lack of evidence thereon, the court's charge as to insanity was mere surplusage. If the instruction be error, then it was harmless error; for the defendant could not be prejudiced by an erroneous instruction of the court as to a defense that is unsupported by any evidence. United States v. Klein, 7 Cir., 108 F.2d 458.

"The Government respectfully concludes that there is no evidence of insanity in the record, and the court's charge on this issue, if it be error, was harmless error."

5. Lee v. United States, supra.

several times, that to be insane the defendant must have been unable to distinguish between right and wrong, and must also have lost control of his will. The defects in the charge were promptly and aptly pointed out by defense counsel.

I fully agree that the charge must be considered as a whole, and so considering it, in view of the importance of this case to the appellant under a sentence of imprisonment for twenty-five years, I attach hereto, as an appendix, the entire portion of the charge particularly relating to the defense of insanity, underscoring some of the instructions which seem wrong to me.[6] When that charge is read in its entirety, it seems to me that argument is superfluous to demonstrate that, even under the McNaghten Rule, it is misleading, confusing and at times erroneous both as to the burden of proof and as to the test of insanity. To charge that the presumption of sanity continues "until the contrary is shown by proof," and again "until he is proven to be insane" seems to me to impose the burden of proof on the defendant, and that error is not cured by conflicting instructions. To charge that the degree of insanity "must have been sufficiently great to have controlled the will," and thereafter twice to couple the right and wrong test in the *conjunctive* with the test of inability to control the will, and finally to conclude with the right and wrong test alone could only leave the jury in a state of utter confusion. While it seems to me that the law has progressed beyond McNaghten, the instant charge is bad by any test.

The defendant may or may not be excusable by reason of insanity. In either event, he is entitled to a fair trial by due process of law, and by a jury properly instructed on the law, and that, in my opin-ion, he has not had. That the jury, if properly instructed, might have reached a different verdict, is amply shown by the record reference to what occurred after the jury retired to consider its verdict (footnote 1, supra).

While the district court may have been acting within its discretion in refusing to respond to the jury's inquiry as to whether the defendant would be committed to an institution in the event he were found not guilty, it seems to me that, in view of the jury's traditional and perhaps wise role as suppliers of deficiencies in the law, it would have been better to answer that inquiry, and that perhaps the defendant's exception to the refusal to answer should be sustained. Not only does the Texas state law contain provisions for committing an insane person to an institution, and the district court could have made recommendations to the State authorities, but, what is more pertinent, it seems to me that the district court itself, if it found the defendant insane, should have certified him to the Secretary of Health, Education and Welfare, who might order him to be confined in Saint Elizabeth Hospital. 24 U.S.C.A. § 211. In any event, decisions of courts, unlike verdicts of juries, do make precedents, and by those precedents the law progresses or fails to progress. The law can come nearer to an ideal instrument for attaining justice if the courts keep firmly as their goal justice *according to law*.

I therefore respectfully dissent.

### Exhibit "A".

The portion in full of the Court's charge to the jury relating particularly to the defense of insanity with parts emphasized which I consider erroneous:

"Insanity as a defense: The defendant, by his counsel, has pleaded not guil-

6. I think that the district court correctly limited the jury's consideration of the issue to the time of the commission of the act. See United States v. Chisholm, C.C., S.D. Ala., 153 F. 808, 810 (incidentally, most of the charge on insanity was borrowed from the opinion of the district court in that case). The court, but not the jury, has to determine whether the defendant is sane at the time of trial, as an essential prerequisite to a fair trial. See McIntosh v. Pescor, 6 Cir., 175 F.2d 95, 97; 23 C.J.S., Criminal Law, § 940b; cf. 24 U.S.C.A. § 211; Haislip v. United States, 76 U.S.App. D.C. 91, 129 F.2d 53, 54.

ty to the charge contained in the indictment, and pleads as a defense that at the time of the taking of the money from the presence of Mrs. E. A. Chestnut, if the jury finds beyond a reasonable doubt that he did take it, as charged in the indictment, he was suffering from insanity.

*"Every person charged with crime is presumed to be sane—that is, of sound memory and discretion—until the contrary is shown by proof.* No act done in a state of insanity can be punished as an offense. The question of the insanity of the defendant has exclusive reference to the act of which he is charged and the time of the commission of the same. If he was sane at the time of the commission of the act, he is punishable by law. If he was insane at the time of the commission of the act, he is entitled to be acquitted. A safe and reasonable test is that whenever it shall appear from all the evidence that at the time of committing the act the defendant was sane, and this conclusion is proven to the satisfaction of the jury, taking, in the (sic) consideration all the evidence in the case, beyond a reasonable doubt, he will be held amenable to the law. Here, whether the insanity be general or partial, whether continuous or periodical, *the degree of it must have been sufficiently great to have controlled the will of the accused at the time of the commission of the act.* Where reason ceases to have dominion over the mind, proven to be diseased, the person reaches a degree of insanity where criminal responsibility ceases, and accountability to the law for the purpose of punishment no longer exists.

*"The real test,* as I understand it, of liability or nonliability, rests upon the proposition whether at the time the defendant, by intimidating Mrs. E. A. Chestnut, took from her presence the money in question, if he did, he had a diseased brain, and it was not partially diseased, or to some extent diseased, *but diseased to the extent that he was incapable of forming a criminal intent, and that the disease had so taken charge of his brain and so impelled it that at the time his will power, judgment, reflection, and control of his mental faculties were impaired so that the act done was an irresistible and uncontrollable impulse with him at the time he committed the act, and he did not then know the difference between right and wrong.* If his brain was in this condition, he cannot be punished; but, if his brain was not in this condition, he can be punished by the law, remembering that the burden is upon the Government to establish that he was of sound mind, and by that term is not meant that he was of perfectly sound mind, but that he had sufficient mind to know right from wrong, and, knowing that the act he was committing at the time he was performing it was a wrongful act in violation of human law, and he could be punished therefor, and that he did not perform the act because he was controlled by irresistible and uncontrollable impulses. In that state of the case the defendant could not be excused upon the ground of insanity, and it would be your duty to convict him. But, *if you find from the evidence, or have a reasonable doubt in regard thereto, that his brain at the time he committed the act was impaired by disease and the taking of the money was the product of such disease, and that he was incapable of forming a criminal intent, and that he had no control over his mental faculties and the will power to control his actions, but took the money in question while he was laboring under a delusion which absolutely controlled him, and that his act was one of irresistible impulse, and not of judgment, and he did not then know the difference between right and wrong;* in that event he would be entitled to your acquittal. However, in the consideration of this question, you must bear in mind, gentlemen, as I have said, that *it is a presumption of the law, justified by the general experience of mankind, as well as of considerations of public safety, that a man is presumed to be sane until he is proven to be insane.* If this presumption was not indulged

the Government would always be under the necessity of adducing affirmative evidence of the sanity of the accused at the outset. And a requirement of that character would seriously delay and embarrass the enforcement of law against crime, and in most cases be unnecessary. Consequently, the law assumes that every one charged with crime is sane, and thus supplies in the first instance the required proof of capacity to commit crime. It authorizes the jury to assume at the outset that the accused is criminally responsible for his acts, but that is not a conclusive presumption; it is a disputable, or often designated a rebuttable presumption.

"*The test of responsibility, where insanity is asserted, is the capacity to distinguish between right and wrong with respect to the act.*"