**Richard Erwin SAUER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15159.**

United States Court of Appeals
Ninth Circuit.

**Feb. 6, 1957.**

---

3. For an evaluation of Mrs. Clemens' testimony, see United States v. Chieppa, D.C., S.D.N.Y.1956, 146 F.Supp. 267, 270.

Alfred H. Song, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Louis Lee Abbott, Asst. U. S. Atty., Chief, Criminal Div., Robert John Jensen, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BONE and BARNES, Circuit Judges, and ROSS, District Judge.

BARNES, Circuit Judge.

Appellant was convicted by jury verdict under an indictment charging a violation of 18 U.S.C.A. § 2113(a), to wit, entering a national bank with intent to commit larceny therein. He was sentenced to a term of five years with recommendation that facilities be made available to him for treatment of his mental condition and epileptic affliction.

I. *The Facts.*

The alleged offense occurred on November 21, 1955, in Los Angeles, California, at approximately 2:45 P.M. At

that time appellant entered the Hill Street branch of the Citizens National Trust & Savings Bank of Los Angeles, a member bank of the Federal Reserve System. He was dressed in dark trousers, a peaked cap, overcoat, sportcoat, and two shirts, one worn underneath the other. Appellant had in his possession a shopping bag, a plastic "Dragnet type" toy revolver, and a holdup note, demanding money and admonishing the recipient to remain silent.[1] The evidence is somewhat in conflict as to precisely what happened thereafter. For purposes of this appeal it is not material. Apparently, appellant spoke with the bank guard who directed him to Mr. Swenson's desk where he informed the bank official in essence that he had come into the bank with the intention of holding it up and that the Federal Bureau of Investigation should be contacted. Appellant added that the F.B.I. had been the only ones who treated him decently and he hoped that he would receive similar consideration in the future. At no time prior to his conversation with Mr. Swenson did appellant display the toy revolver or the note or make any overt attempt to actually rob the bank. All of these events are recorded in a subsequent confession given the F.B.I. (Government Exhibit 5, Tr. 48–49.)

The sole ground of appeal relates to the adequacy of the instructions regarding insanity. Appellant contends that the trial court erred in not instructing the jury in accordance with the instructions suggested, and set forth in part at least, in the now historic Durham decision.[2] Instead the trial court reluctantly instructed the jury in terms of the traditional right and wrong test as supplemented by the so-called irresistible impulse rule.[3]

## II. The Present State of the Law.

### A. The Definition of Insanity in This Circuit.

The decision of this court in a very recent case, Andersen v. United States, 237 F.2d 118, decided September 21, 1956, is determinative of this question unless we choose to overrule that decision. In that case the instruction given was substantially identical with that in the instant case. There, as here, appellant urged this court to adopt the Durham rule. The holding of this court in the Andersen case was an express rejection of the Durham rule and a reaffirmation of the well-established formula contained in M'Naghten's Case, 10 Cl. & F. 200, 210; 8 Eng. Rep. 718 (1843), as extended by the "irresistible impulse" theory. We choose to adhere to this court's previous position, and regard the Andersen case as controlling.[4]

### B. The Definition of Insanity in the Supreme Court.

Furthermore, even in the absence of the Andersen case, it is very doubtful that the question is an open one. Whether it is or is not an issue amenable to decision by a Court of Appeals depends on an interpretation of the two Supreme Court opinions in Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, and 165 U.S. 373, 375, 17 S.Ct. 360, 41 L.Ed. 750. In the first Davis case the Supreme Court reversed a conviction of murder on the ground of error in the instruction on the burden of proof in respect to the matter of insanity.[5] Al-

1. The note, Government Exhibit 3, reads: "Be quiet and you will not get shot— Hand over all your 5–10–20 and be quick, do not make a wrong move I'm watching."

2. Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

3. On several occasions, following conviction, the court below referred to the instructions given as "ancient" and "archaic." (Tr. 228, 245, 249.) Neverthe-

less, he felt bound to give them. (Tr. 215–216).

4. Cf: United States v. Fore, D.C.1941, 38 F.Supp. 140.

5. The Supreme Court held that: "If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an

though not necessary to the decision, the Supreme Court discussed the nature of the substantive legal test of insanity, referring to M'Naghten's Case, and noting that one cannot be held criminally responsible "unless at the time he had sufficient mind to comprehend the criminality or the *right and wrong* of such act," [6a] and that "the crime of murder involves sufficient capacity to distinguish between right and wrong." [6b] Upon remand of the case, Davis was again convicted, and on appeal the Supreme Court affirmed. The instruction on insanity given in the second trial was identical to that given in the first trial and is exactly a portion of the instruction given by the court below in the instant matter. (Tr. 215.) It provides:

> "The term 'insanity' as used in this defense means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or where, though conscious of it and able to distinguish between right and wrong and know that the

act is wrong, yet his will, by which I mean the governing power of his mind, has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, and are beyond his control."

The Supreme Court held that this charge "under the circumstances of this case, was in no degree prejudicial to the rights of the defendant." [7] The Supreme Court thus at least tacitly approved the test as being either incapacity (resulting from some mental disease or defect) to distinguish between right and wrong with respect to the act, or, although able to so distinguish, the inability to refrain from committing the act. There is nothing in subsequent Supreme Court opinions on this question which casts doubt on this construction of the Davis cases. Indeed, they serve only to fortify the view here expressed.[8]

### C. The Definition of Insanity in Other Circuits.

In addition, the only other Circuit which has had an opportunity to consider this question since the Durham decision, the Fifth Circuit, shares our belief that we are not free to revise the

---

acquittal of the specific offense charged." 160 U.S. 488, 16 S.Ct. 358.

The court below correctly instructed the jury as to the burden of proof on the issue of insanity. (Tr. 217)

**6a.** 160 U.S. at page 485, 16 S.Ct. at page 357.

**6b.** 160 U.S. at page 488, 16 S.Ct. at page 358.

**7.** 165 U.S. at page 378, 17 S.Ct. at page 362.

**8.** In Hotema v. United States, 186 U.S. 413, 420, 22 S.Ct. 895, 898, 46 L.Ed. 1225, the Supreme Court, in affirming a conviction in this capital case, stated: "The court had already properly instructed the jury as to the test to be applied to the general defense of insanity. In substance it had charged the jury that if defendant knew the nature and quality of his act when he committed it, and that it was wrong and a violation of the law of the land, for which he would be punished, that he was responsible for the act he

committed. And upon the matter of irresistible impulse, the charge was, as we have said, at least as favorable to the defendant as he had any right to ask."

The Court reaffirmed its approval of the instruction given in the Davis case in Matheson v. United States, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631. The opinion of the Court in Fisher v. United States, involving the question of partial responsibility, makes reference to the fact that the accused "was then sane in the usual legal sense. He knew right from wrong. See M'Naghten's Case. * * *." 328 U.S. 463, 466, 66 S.Ct. 1318, 1320, 90 L.Ed. 1382. And the last time the Court had occasion to address itself to this problem, it held that there is no constitutional necessity for state courts to eliminate the right and wrong test from their criminal law. Leland v. State of Oregon, 343 U.S. 790, 801, 72 S.Ct. 1002, 96 L.Ed. 1302. See also, Lee v. United States, 5 Cir., 91 F.2d 326, 330; Perkins v. United States, 4 Cir., 228 F. 408.

law of criminal responsibility even if we were disposed to do so. Howard v. United States, 5 Cir., 232 F.2d 274, 275.

 In light of the ever increasing outcry for modification of the conventional rules of criminal responsibility, perhaps it would be in order to observe the structure of the Federal judiciary system. The Court of Appeals is the intermediate court in the Federal judicial hierarchy; the Supreme Court the court of last resort. When the Supreme Court speaks, its voice is that of the ultimate judicial authority. We are bound to heed its pronouncements. At times its voice has not been heard, either because the question presented below is novel, or because the Supreme Court, in its wisdom, did not choose to decide the matter previously. Occasionally, the sound is merely suggestive; not compelling, but advising; and then there are the instances in which the Court speaks loudly and clearly. In these situations we must follow its command. This is such a case.

The question arises, how then, if the Supreme Court meant in the Davis and subsequent cases what the Fifth and this Circuit believe it meant, could Durham have been born? One answer lies in the unique status held by the courts of the District of Columbia as compared with other Federal courts. The Courts of the District of Columbia are possessed of far greater autonomy in the decision-making process than are courts in other circuits. This point is forcefully and dramatically borne out by the Fisher case, supra. (Note 8.) On appeal from a conviction of murder for which a sentence of death was imposed, the defendant urged the Supreme Court to declare that "mental weakness, short of [that necessary to constitute] legal insanity", 328 U.S. at page 473, 66 S.Ct. at page 1323, be a relevant factor in determining whether an accused is guilty of murder in the first degree, (a crime in which premeditation and deliberation are essential elements) or murder in the sec-

ond degree. The Supreme Court, conscious that a man's life was at stake, expressly declined to rule on the merits of the contention, stating:

> "We express no opinion upon whether the theory for which petitioner contends should or should not be made the law of the District of Columbia. * * *
>
> "Matters relating to law enforcement in the District are entrusted to the courts of the District. Our policy is not to interfere with the local rules of law which they fashion, save in exceptional situations where egregious error has been committed.
>
> "Where the choice of the Court of Appeals of the District of Columbia in local matters between conflicting legal conclusions seems nicely balanced, we do not interfere [citations omitted]. The policy of deferring to the District's courts on local law matters is reinforced here by the fact that the local law now challenged is long established and deeply rooted in the District." 328 U.S. at pages 476-477, 66 S.Ct. at page 1325.

The Court of Appeals for the District of Columbia was thus at liberty to promulgate a different rule of criminal responsibility than that approved by the Supreme Court in prior decisions. We do not have such authority.

### III. *The Problem Before This Court.*

Believing as we do that the lone issue in the instant matter is controlled by the decisions of both the Supreme Court and this court and that the question cannot be regarded as an open one, we would ordinarily be inclined to conclude our discussion at this point and affirm the judgment. However, the question at bar, far from being ordinary, is perhaps the most controversial problem existing in the criminal law today.[9] It is a question which has generated much debate and is deserving of much light. Moreover, because we are required to

---

9. Weihofen, Insanity as a Defense in Criminal Law, (1933) page 1.

follow the rule of M'Naghten's Case does not mean we are satisfied with it, or endorse it with absolute finality for all time to come.

This is a problem which this court has strangely never had occasion to consider at length until the appeal in the Andersen case and the instant proceeding. It is, therefore, a problem through which the district courts of this circuit have been compelled to chart their own course, guided only by the language of the Davis cases. In the hope of giving some aid to our trial jurists who in turn will illuminate the jury's path in performing its task of determining criminal responsibility, further exposition of our views seems merited.

At the beginning it is appropriate to state that even if we were free to decide this question anew—the same result would be reached. The rule of the Durham case would be rejected.

The rule of the Durham case refers to the test of criminal accountability enunciated in Judge Bazelon's provocative opinion, a test which is neither linguistically complex nor verbose. In Judge Bazelon's own words,

> "It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." 214 F.2d at pages 874–875.

The test adopted in the Durham case is not new. It is based almost wholly, as the court itself recognized, on the decisions in two old New Hampshire cases.[10] Those cases were decided over eighty years ago. Yet the majority of no other American court, until the Durham case, and no State legislature, saw fit to accept that formulation of the rule of criminal responsibility. And it is interesting to note, that the three appellate Federal courts which have considered the question since the Durham decision was handed down, have all rejected that approach.[11]

### A. Advantages Seen in the Durham Rule.

The chief advantage of the Durham test, according to its proponents, is that under it the jury is no longer required to rely on specific and particular mental symptoms in determining criminal responsibility, but that all relevant evidence as to mental condition goes to the jury on the ultimate question of fact.[12] The court pointed out that psychiatry now recognizes that man is an integrated personality; that the forces that drive him cannot be compartmentalized. Hence, it is urged that the M'Naghten test, which emphasized the intellect or cognitive element and consequently de-emphasizes the volitional and emotional facets of personality, is not only misleading and inadequate, but an impossible guide.[13] The Durham decision is

---

10. State v. Pike, 1870, 49 N.H. 399; State v. Jones, 1871, 50 N.H. 369.

11. Howard v. United States, supra; Andersen v. United States, supra; United States v. Smith, 5 U.S.C.M.A. 314, 17 C.M.R. 314. Cf. Thomas v. State, 206 Md. 575, 584–585, 588, 112 A.2d 913; State v. Kitchens, Mont., 286 P.2d 1079, 1082; People v. Ryan, 140 Cal.App.2d 412, 295 P.2d 496, 504; Flowers v. State, Ind., 139 N.E.2d 185; United States v. Fielding, D.C.D.C., 148 F.Supp. 46.

12. "The full merit of the New Hampshire decision and of the more recent District of Columbia opinion in the Durham case is precisely that they do not attempt to embody one set of medical theories in place of another, for even if it were possible to frame a test embodying more

modern knowledge there would still be the danger that in the progress of science the new rule itself might be found inadequate. The whole point is not to restrict the test to particular symptoms, but to permit as broad an inquiry as may be found necessary according to the latest accepted scientific criteria." Soboleff, Insanity and the Criminal Law: From McNaghten to Durham, and Beyond, 41 A.B.A.Jour. 793, 795 (Sept. '55).

13. "M'Naghten's Case * * * assumes the existence of a ' * * * logic-tight compartment in which the delusion holds sway leaving the balance of the mind intact * * * '; the criminal retains enough logic in his sanctuary of reason so that he may inform himself as to what the other part of his mind, the in-

said to have the further effect of permitting the expert witness to carry out his proper role of informing the jury of the nature of the mental disorder suffered by the accused, without limiting him to the "moral" question of right and wrong.

One evident consequence of the Durham decision is to shift the entire question of criminal responsibility to the jury. Some say this is as it should be, viewing the question of responsibility as solely one of fact. Under the M'Naghten rules, a division of authority exists. It is the function of the court to develop a standard of criminal responsibility, based on the moral and ethical standards of the community, and it is for the jury to ascertain, first, whether the accused is in fact a victim of mental disorder, and secondly, whether his affliction meets the criteria established by the courts.

The Durham opinion has generally been regarded as a response by the law to progress achieved in the field of psychiatry. It has been the recipient of much favorable comment.[14] But it is far from having obtained universal acceptance.

> sane part, has compelled or permitted his body to do. If the sane portion of the accused's mind knows that what the insane part compels or permits the body to do is wrong, the body must suffer * * * by punishment. * * * The human mind, however, is an entity. It cannot be broken into parts, one part sane, the other part insane."
>
> From dissenting opinion, United States ex rel. Smith v. Baldi, 3 Cir., 192 F.2d 540; quoted by Chief Judge Biggs in his remarkable book, "The Guilty Mind: Psychiatry and the Law of Homicide.", p. 133, which attributes the inside quotation to Glueck's, "Mental Disorder and the Criminal Law.", pp. 169–170.

14. Sobeloff, supra; Zilboorg, "A Step Toward Enlightened Justice", 22 Univ. of Chicago L.R. 331; Biggs, "The Guilty Mind," Chapter VI, p. 149 et seq.; Law Review comments approving the new test include: 40 Cornell L.Q. 135; 23 Geo. Wash.L.Rev. 225; 68 Harv.L.R. 363; 53 Mich.L.R. 963; 28 S.C.L.R. 86; and, 40 Vand.L.Rev. 799.

## B. Disadvantages Seen in the Durham Rule.

The Durham rule has been subjected to articulate and persuasive criticism by distinguished commentators.[15] Though the psychiatrists view the Durham opinion as their Magna Carta, it appears that it may raise almost as many questions as it resolves.

Grave concern has been expressed over the interpretation to be given the words, "disease," "defect," and "product." [16] The two former words are defined in the Durham decision; the latter is not. The defined words have been construed by some to include the psychopath, and a subsequent opinion by the District of Columbia Court of Appeals indicates that that construction may be correct.[17] If it does—and we do not pass on the question—it would raise fundamental problems involving public policy and the purposes of the criminal law.[18] This is not an appropriate occasion to undertake such a basic review.

The word "product" has been termed too indefinite. As Judge Brosman stated in his excellent opinion in the Smith case, supra, at p. 322,

15. See Wechsler, "The Criteria of Criminal Responsibility," 22 Univ. of Chicago L.R. 367; Wertham, "Psychoauthoritarianism and the Law," 22 Univ. of Chicago L.R. 336.
 Also expressing doubt as to the value of the new test are comments in 54 Columbia L.Rev. 1153; 27 Rocky Mt.L.Rev. 222. See also, Hall, "Responsibility and Law: In Defense of the McNaghten Rule," 42 A.B.A.Jour. 917 (Oct. 1956).

16. See Wechsler article, supra, at p. 368. The indefiniteness of the term "product" led the American Law Institute to reject the Durham test in its proposed Model Code.

17. Stewart v. United States, 94 U.S.App. D.C. 293, 214 F.2d 879.

18. Any such examination would necessarily entail an analysis in the context of what Justice Holmes characterized, "The first requirement of a sound body of law * * that (is) it should correspond with the actual feelings and demands of the community, whether right or wrong." The Common Law 4 (1881).

"In the first place, we are—it must be confessed—somewhat troubled by the uncertainty of the criterion set down in Durham to the effect that, to be exculpable, a criminal act must be the 'product' of mental abnormality. Indeed, there may be some controversy concerning the scientific validity of the premise that a criminal act may be committed which is not, in some sense, a product of whatever abnormality may coexist."

See also the Wechsler article, supra. If the word means that the jury must find that the accused would have committed the act even if he had not suffered from the abnormality involved, the test is too broad. If the test is, as Judge Sobeloff believes, one of causation, then the court is introducing into an area already burdened with serious problems a concept which has plagued the law of torts since its inception.

Furthermore, the release of psychiatrists from the "strait jacket" of M'Naghten's Rules can hardly be regarded as a panacea for the problem of communication from medical expert to layman.[19] This communication is a semantic problem that faces judges and attorneys daily. It is difficult to solve, but the solution may better lie, not in the layman accommodating the specialist, but rather in the adjustment by the specialist of his technical vocabulary to the language of the layman. It should be added that some of the "strait jacket" argument is based on a lack of a real understanding of the operation of trial courts. There appear to be some who believe that the expert witness is asked but one question: "Did the accused know right from wrong?" Nothing could be further from the truth. The inquiry quoted is but the ultimate question. For example, in the instant matter, Dr. Vernon Miller, the court appointed psychiatrist, testified at length regarding the appellant's disorders before he was asked the critical question. The appellant's entire mental condition was brought to the attention of the jury. Dr. Miller cogently and concisely described appellant's abnormality in language that could be clearly understood by the jury. If he was verbally confined in a "strait jacket," it is apparent that he did not know it and that no one took the effort to inform him of it.

The abdication of responsibility for determining the standard of criminal responsibility by the court in the Durham case exposes the court to the same criticism levied against the New Hampshire decisions.[20] The Smith case also casts doubt as to the wisdom of a rule which furnishes no guide for the jury to employ in its deliberations.[20a] Without a channeling instruction, Smith in-

19. On this same point, the court in the Smith case, supra, at p. 324, noted: "In light of the esoteric nomenclature used in the field and the hypertechnical divergence between various schools of psychiatric thought, as well as because of the complexity and sheer uncertainty of the area under exploration, it can readily be imagined what wholesale want of enlightenment would eventuate from purely medical testimony from the witness-psychiatrist."

20. Professor Wharton felt that the jury should not be given this additional duty, because, (1) it does not form a continuous body prepared for its office by prior study, and (2) the reasons for its decisions are not given so as to form a basis for future decisions, and (3) there is no "supreme" jury by whom the errors of "inferior" juries can be corrected. Wharton & Stille, "Medical Jurisprudence," pp. 178 et seq.

20a. In this respect, see also, United States v. Fielding, D.C.D.C., 148 F.Supp. 46, wherein Judge Holtzoff states: "In one sense it may be argued that the two tests [general Federal and Durham] are interchangeable. The basic difference between them is that the Pike and Durham formula is couched as an abstract, indefinite generality, which accords a greater freedom and range to scientific speculation and inquiry, and does not impose on expert witnesses a duty of precision of thought or statement; whereas the other standard is a concrete proposition that a layman can apply, and which offers a more or less definite guide, insofar as any guide is possible in this abstruse field."

dicates, there is little chance of securing a uniform and consistent rule. The resulting uncertainty would breed disrepute of the law. Moreover, the plea of insanity, presently under heavy criticism as a frequently used ruse in homicide cases, would thus be made even more attractive to an accused.[21]

Most importantly, however, the Durham case must be examined in the light of the purposes of the criminal law. It is here that the new rule must face its final test. And it appears that at least one eminent authority may not believe that it measures up.[22]

Whatever we may conclude to be the objectives of the criminal law, one traditional result has been punishment. Functioning under such a system, our society does not assess punishment where it cannot ascribe blame. It is inimical to the morals and ideals of an organized social order to impose punishment where blame cannot be affixed. Man is regarded as a moral being. Modern psychiatry to the contrary, the criminal law is grounded upon the theory that, in the absence of special conditions, individuals are free to exercise a choice between possible courses of conduct and hence are morally responsible. Thus, it is moral guilt that the law stresses.

 At least one purpose of the penal law is to express a formal social condemnation of forbidden conduct, and buttress that condemnation by sanctions calculated to prevent that which is forbidden. The ultimate goal is deterrence. In attempting to achieve this end we employ means which secondarily satisfy the retributive feelings of society. Any theory of criminal responsibility must be evolved in light of these purposes, else it will be unacceptable to some considerable segment of society.

Much of the conflict over the rules of criminal responsibility is attributable to a basic misconception as to the nature of the problem. Criminal responsibility is a legal not a medical question.[23] Involved is legal consequence, not medical diagnosis. Indeed, we are told by recognized authorities that the word "insanity" has no medical significance;[24] that no such condition has been found; and that there are serious doubts that such condition exists. This information is transmitted by voices tinged with alarm. The fears are misplaced. The law is not endeavoring to pioneer in

21. A shocking instance in which the insanity plea was successfully invoked is that of Martin Laven, a three-time murderer who feigned insanity and avoided trial, thus gaining the freedom that enabled him to kill for the fourth time. Wertham, "The Show of Violence," (1949). Cf. White; "Insanity and the Criminal Law," (1923) pp. 107–127.

22. "The truth appears to me to be that the question goes to the heart of whatever we choose to make our purpose in criminal punishment. It is only indirectly, or at second hand, a psychiatric question.

"My own ideas, insofar as I have any, are that there are two controlling factors to consider. One is how far imprisonment is effective as deterrent * * * The other fact is that most people have a feeling that 'justice' requires a law breaker to suffer, just as they think that sin should entail suffering in the sinner." Letter of Judge Learned Hand to Editor, 22 Univ. of Chicago L.Rev. 319.

23. "As courts and commentators have repeated to the point of tedium, the criteria are addressed to the question of when disorder or defect should be accorded the specific legal consequences of a defense to criminal conviction, with the special differences in dealing with the individual that this special legal consequence entails. Thus the criteria are not concerned with the indicia of diagnosis of disease; they are concerned with the effects that a disease must have on the defendant if it is to work the exculpation claimed." Wechsler, 22 Univ. of Chicago L.Rev., supra, at p. 373.

24. "In medicine the term usually has no meaning. There is no disease called insanity." Wertham, "The Show of Violence", (1949) pp. 15, 86; Zilboorg, "The Psychology of the Criminal Act and Punishment", (1954) pp. 16, 125; White, "Insanity and the Criminal Law", (1923) p. 102.

medical science. When the word "insanity" is used, it can be no more and no less than a shorthand legal expression to describe the consequences which certain symptoms of various mental diseases or defects produce in the law. Its meaning may vary with the purpose at hand. It may mean one thing in respect to capacity to make a valid contract and a far different thing as it pertains to criminal responsibility. Perhaps the confusion would be alleviated if the term "insanity" could be relegated to the wastebasket.

It seems plain that, as the Supreme Court stated in the Leland case, supra, 343 U.S. at page 801, 72 S.Ct. at page 1008, the "choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility."

**IV.** *The Present Majority Solution to the Problem.*

The majority of American courts, having from time to time weighed progress in psychiatry against the fundamental concepts and purposes of the criminal law, have re-adopted M'Naghten's rules as the exclusive test of criminal responsibility. Some fourteen states and the Federal courts have supplemented the traditional rules with varying definitions of an "irresistible impulse" test.

The right and wrong test has withstood the onslaught of critics, not because it is scientifically perfect, but because the courts regard it as the best criteria yet articulated for ascertaining criminal responsibility which comports with the moral feelings of the community.

Calling attention to semantic problems in the Durham rule does not mean that we feel there are none that arise in connection with the M'Naghten rules as to the meaning that should be given certain words. The two most troublesome are "know" and "wrong". As to the former, there is surprisingly little authority in the cases as to whether it means mere verbal knowledge or emotional appreciation. If juries construe it in the former manner, the test is indeed severe. Professor Hall recommends that the latter interpretation be given the word so that the right and wrong test may be coordinated with modern psychiatry which views man as an integrated personality.[25] The usual practice is to just say "know" to the jury, and let it go at that.

As to "wrong," the question is whether that means legal or moral wrong? The English courts, and two of our state courts that have ruled on the question, hold that knowledge that the act contravenes the law of the land is sufficient to impose criminal liability. Reg. v. Windle, 1952, 2 Q.B. 826; McElroy v. States, 146 Tenn. 442, 242 S.W. 883; Harrison v. State, 44 Tex.Cr.R. 164, 69 S.W. 500. In the Smith case,[26] the court declared that a belief in the moral rightness of the act would not constitute a defense if the accused realized its legal wrongfulness. And it would appear that the language in the Hotema case, supra, supports that decision. However, in People v. Schmidt, 216 N.Y. 324, 110 N.E. 945, L.R.A.1916D, 519, Judge Cardozo, speaking for the court, states, a notion that the act was morally right would excuse the defendant. Here again, the practice has been to state merely the word "wrong" and leave the decision for the jury.

While not entirely condonable, such practice is explained in large measure by an awareness that the jury will eventually exercise a moral judgment as to the sanity of the accused. A penetrating insight on this function of the jury is contained in an opinion written by Judge Thurman Arnold.[27]

25. 45 Columbia Law Review, p. 677.

26. United States v. Smith, 5 U.S.C.M.A. 314, 17 C.M.R. 714.

27. "The application of these tests, [for insanity] however they are phrased, to a borderline case can be nothing more than a moral judgment that it is just

The expansion of the strict M'Naghten test to include those persons who although they know right from wrong cannot, because of mental disorder, choose between them, is a recognition that volition as well as intellect is a component of the capacity for self-control. Most courts recognize this volitional incapacity in terms of "irresistible impulse." See for a leading case on the point, Parsons v. State, 1887, 81 Ala. 577, 2 So. 854. Such wording has been criticized by writers insofar as it connotes only, and is limited to, spontaneous sudden feeling. Such urges may be the result of long periods of brooding and reflection. Hence, "irresistible impulse" is perhaps an inept phrase, but it can be used until a better semantic handle has been created. The fact that the trial court here used that term cannot constitute prejudicial error, in light of previous cases approving it, and the entire instruction on criminal responsibility.

Skepticism concerning its existence medically, (one psychiatrist, Wertham, doubts its validity; most other psychiatrists feel it is clinically discernible) and the difficulty of proof, have led many courts to reject various formulations of the "irresistible impulse" rule. However, it was adopted by the District of Columbia in Smith v. United States, 59 App.D.C. 144, 36 F.2d 548, 70 A.L.R. 654.[28]

Perhaps a revision of the rules of criminal responsibility would be forthcoming if the law felt it could place greater trust and confidence in psychiatry. The spectacle not only of individual psychiatrists in disagreement, but also entire divergent schools of thought is not an inspiring one. As one authority stated, "[P]sychiatry is still more of an art than a science." [29]

## V. The Necessary Concomitant.

But there is another, and possibly the most significant reason, why this court must refuse to modify existing law. Many observers implicitly assume in their criticism of present law that if the accused is set free on the criminal side that he will be confined on the civil. Unfortunately, that is not the case. If it were, this court might be much more disposed to alter its current views. The choice today in this jurisdiction is not between confinement and commitment, but rather between confinement and freedom.[30]

or unjust to blame the defendant for what he did. Legal tests of criminal insanity are not and cannot be the result of scientific analysis or objective judgment. There is no objective standard by which such a judgment of an admittedly abnormal offender can be measured. They must be based on the instinctive sense of justice of ordinary men * *." Holloway v. United States, 80 U.S.App. D.C. 3, 148 F.2d 665, 666.

28. It might be well to consider the elimination of the words "irresistible impulse" from jury instructions. One proposed solution is the following suggested addition to be read at the conclusion of the statement of M'Naghten's rules:
"If by reason of a disease of the mind, the defendant has been deprived of or lost the power of his will which would enable him to prevent himself from doing the act, then he cannot be found guilty."
This proposed instruction eliminates the confusing term "irresistible impulse" and appears to be somewhat less complicated than that contained in the Davis case, although the meaning seems the same. The proposed instruction is taken from that recommended by the New Mexico Supreme Court in the recent case of State v. White, 58 N.M. 324, 270 P.2d 727, 730.

29. Sullivan, quoted in Prof. Hall's Article, 45 Columbia Law Review 677.

30. One of the most eloquent advocates for the elimination of M'Naghten's rules clearly recognized the necessity for the co-existing of procedures for commitment.
"Why does their application (of the M'Naghten's Rules) constitute a danger to the public? Because the mental competency of recidivists should be questioned by realistic means at the earliest possible stage. So long as the courts judge criminal responsibility by the test of knowledge of right and wrong, psychotics who have served prison terms or are granted probation are released to commit increasingly serious crimes, repeating crime and incarceration and re-

This, however, is not the situation in the District of Columbia, nor was it at the time Durham was decided. In fact, Judge Bazelon carefully noted that the decision would not set Durham free. Under the then existing D.C.Code provision, Sec. 24–301, if the jury found the accused not guilty solely by reason of insanity, it was required to so state. The statute further provided that the court "may" then have him committed. Congress, however, was obviously concerned that commitment was discretionary, and so by an amendment passed on August 9, 1955, commitment was made mandatory.

Unlike the District of Columbia, and the procedure in some State courts, there is no similar provision governing the conduct of trials in other Federal courts. The defense of insanity comes under the "not guilty" plea, and the jury is not required to state specifically its grounds for acquittal.[31] Thus there is no way for the Government to determine the basis of the jury verdict. It therefore sets the accused free. As a case in point, consider the instant matter. One could hardly find a factual situation in which there is less dispute as to what transpired. Yet if the jury found the appellant not guilty, how could the court, the Government or anyone ever know that it was because of insanity, or because the jury believed he lacked the necessary specific intent at the time he entered the bank?

Dr. Miller testified in this case that appellant suffers from an epileptic condition characterized by grand mal seizures, petit mal episodes, and psychomotor episodes. However, he stated that appellant did not suffer an attack from this condition while committing the offense charged. Dr. Miller also stated that appellant has a mental disorder which he termed a schizophrenic reaction of the hebephrenic type. In essence, this means that the individual is silly, has poor control of his emotional responses, and poor reasoning power. He was of the opinion that appellant is a passive dependent personality, and that such a person "finds it rather difficult to make decisions regarding their adult responsibilities. They don't handle adult problems very well." He testified that appellant has a "dependent" and "inadequate" personality, and he recommended that appellant be institutionalized. Yet, if the jury acquitted appellant on the ground of insanity, there is no provision in the United States Code which would authorize the Government to have appellant committed.[32] That a regrettable void

---

lease until murder is committed. *Instead of being treated as are ordinary criminals, they should be confined to institutions for the insane at the first offense and not be released until or unless cured."* (Emphasis added.) Biggs, "The Guilty Mind", Chap. V., p. 144, et seq. See also Section IV, "Recommendations of the Committee in Psychiatry and the Law, of the Group for the Advancement of Psychiatry," Dr. Philip Q. Roche, of Philadelphia, Chairman. These provide that when a defendant is acquitted on the defense of mental illness, the verdict shall so be recorded, and "the Court shall immediately commit the defendant to a public institution for * * * custody, care and treatment * * *"

31. Criminal Code and Criminal Procedure, Rule 12(a), 18 U.S.C.A. Cf. United States v. Fore, supra, 38 F.Supp. at page 141. "The issue of insanity may be presented under the plea of not guilty."

32. There are statutory provisions dealing with mental incompetency after arrest and before trial, 18 U.S.C.A. §§ 4244, 4245, and incompetency subsequent to conviction, 18 U.S.C.A. § 4241. The constitutionality of these provisions was upheld in Greenwood v. United States, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412.

The only other section possibly applicable to persons who successfuly invoke the defense of insanity is 24 U.S.C.A. § 211. See dissenting opinion by Judge Rives in Howard v. United States, 5 Cir., 229 F.2d 602, 608. However, a careful reading of that section reveals its inapplicability to such situations, for it pertains solely to persons found to be insane, a finding which as discussed above cannot be made under existing federal criminal procedure. Moreover, the title of the section refers to persons "accused of crime," and, the section has been administratively construed as applicable

# 652

exists in the law today in this respect is readily apparent. As Judge Brosman stated in Smith, supra, at p. 322:

"The authority to determine who shall be committed as insane should in practice be linked with the determination of who shall be acquitted as mentally irresponsible—since in the ordinary case, a person properly acquitted by reason of insanity requires treatment in a mental institution. Yet, unless commitment procedures are integrated with the administration of criminal law, there is more than a fair risk that an accused may avoid both the jail and the asylum."

## VI. *Conclusion.*

Counsel has urged upon us that two members of the Supreme Court are apparently ready to adopt the Durham rule or some equivalent thereof.[33] A division of opinion exists in the Circuits. It would seem therefore that this is an ideal situation in which to attempt to obtain a definitive ruling on this point.

██ But it is not for this court to undertake a drastic revision in the concept of criminal responsibility, a task which would necessitate a searching analysis of philosophies, purposes, and policies of the criminal law, and which might substitute freedom of insane persons for either confinement or commitment. If change there is to be, it must come from a higher judicial authority, or from the Congress.

The judgment of the District Court is affirmed.

only to persons charged with crime before District of Columbia courts. 17 Op.Atty. Gen. 211. It is interesting, in passing, to note that one possible method of handling those persons found insane at trial (were such a finding possible), is delivery to the proper State authorities, as already employed in respect to the release of insane prisoners upon the expiration of their sentences. 18 U.S.C.A. § 4243.

33. Testimony of Frankfurter, Felix, Report of Royal Commission on Capital Punishment, 1949–53 Cmd. No. 8932, at p. 102; The Durham Rule: A Meeting Ground for Lawyers and Psychiatrists, Douglas, William O., 41 Iowa Law Review, 485 (1956).