Horace SIMPSON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17442.

United States Court of Appeals
District of Columbia Circuit.

Argued March 28, 1963.

Decided June 6, 1963.

Petition for Rehearing En Banc Denied
En Banc Aug. 1, 1963.

Mr. Philip W. Amram, Washington, D. C. (appointed by this court), for appellant.

Mr. Barry Sidman, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker and Tim Murphy, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and BASTIAN and WRIGHT, Circuit Judges.

PER CURIAM.

After a trial by jury, appellant was convicted of assault with a dangerous weapon and assault with intent to kill, and was sentenced to three to nine years imprisonment. His appeal centers about the trial court's instruction relating to his defense of insanity.

Appellant presents "no objection * * to the basic statements of the court in its charge on sanity." He objects only to the "right and wrong gloss" the court introduced into the instructions when it illustrated its correct definition of product. The pertinent portion of the charge reads as follows:

"As an example of this causal connection or relation, if a person at the time of the commission of a crime is so deranged mentally that he cannot distinguish between right and wrong, or, being able to tell right from wrong, he is unable by virtue of his mental derangement to control his actions, then his act is the product of his mental derangement."

In McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847, 851 (1962), we said "the jury should be told that a mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." We said, too, that "the jury may be instructed, provided there is testimony on the point, that capacity,

or lack thereof, to distinguish right from wrong and ability to refrain from doing a wrong or unlawful act may be considered in determining whether there is a relationship between the mental disease and the act charged. It should be remembered, however, that these considerations are not to be regarded in themselves as independently controlling or alternative tests of mental responsibility in this Circuit. They are factors which a jury may take into account in deciding whether the act charged was a product of mental disease or mental defect." Id. at 851–852.

■ It is true that the record here reveals no testimony directly bearing on appellant's ability to distinguish right from wrong. But we cannot say that, in the circumstances of this case and in the absence of objection to the instruction at trial, the court's charge was infected with plain error. See Rules 30 and 52(b), F.R.Crim.P.

■ Appellant also complains about the following instruction given by the trial court on the weight to be accorded expert testimony:

"On the issue of insanity there was called in this case a psychiatrist, a person who, by profession, is known as an expert in his particular field, in other words, a doctor specializing in psychiatry.

"A person who, by education, study, or experience, has become an expert in any art or science or profession, and who is called as a witness, may give his opinion as to any such matter in which he is versed, and which is material to the case.

"Such witnesses are referred to as expert witnesses.

"You should consider the testimony of the expert and weigh the reasons, if any, given for his opinion.

"You are not, however, bound by such opinion. You may give to his opinion such a weight as you deem it entitled to receive, and you may reject expert testimony if, in your judgment, the reasons for that opinion are unsound."

The psychiatrist referred to was called by the Government and he relied, for the most part, on the opinions, reports and tests of others. Appellant says that under our decision in Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637 (1962), the jury must be cautioned that such reliance is a factor in weighing such testimony. But it was not requested and we cannot say that the trial court's failure to so inform the jury constitutes plain error in the circumstances of this case.

We have considered appellant's other claims and find no error requiring reversal. The conviction must therefore be

Affirmed.

BAZELON, Chief Judge (concurring in part and dissenting in part).

I concur fully in the reasoning and conclusions of the court in regard to the claims raised by the parties. My reading of the record, however, reveals a situation which merits consideration although not brought to our attention by the parties.

On August 25, 1961, about one month after appellant was indicted herein for cutting his estranged wife's throat, he filed a pro se motion for a mental examination. He alleged:

"For the past several years I have been under medical care for epilepsy and a severe case of syphilis. No one knows whether I actually suffer from brain damage as a result of paresis, as I have never had the money to pay for such extensive tests * * *. I have no memory [of assaulting my wife with a butcher knife]; but I frequently "black out" and have no memory of what I do. I love my wife and four children and cannot imagine attacking my wife * * *. The jail keeps me on sedatives and tranquilizers to reduce the epileptic attacks * *.

Could I please have a medical and mental examination [and get treatment at St. Elizabeths]."

On September 1, 1961, counsel for appellant filed a similar motion alleging that "defendant appears of faulty memory with distinctly impaired ability to concentrate and suffers from recurrent headaches * * * and chronic alcoholism * * *. That defendant complains of 'black out' periods of indeterminate length * * *. That a psychiatric evaluation of defendant by the Legal Psychiatric Service, associated with this Court, on or about July 14, 1959, tends to confirm the above while also reporting subnormal intelligence." On the same day the trial court ordered defendant committed to St. Elizabeths for a mental examination pursuant to D.C.Code § 24–301. The superintendent of St. Elizabeths reported to the court on November 29, 1961 that defendant "is mentally competent to understand the nature of the proceedings against him and consult properly with counsel in his own defense," and that "no evidence of mental disease existing at the present time nor on or about" the date of the alleged crime was found.

At trial defendant testified in his own behalf. His testimony included the following:

"Q. Prior to that time, Mr. Simpson, to your knowledge, did you ever blackout?

"A. I have quite a few times.

"Q. How often would you blackout?

"A. Well, see, that is kind of hard to tell. It depends on the conditions and the pressure. In the summer time sometimes I could fall out quite often and in the winter, depending on how I have been taking care in the winter.

"Q. How do you know you blacked out, Mr. Simpson?

"A. Sometime I don't know.

\* \* \* \* \* \*

"Q. And did there come a time when you were arrested?

"A. Certainly.

"Q. And how long after this were you arrested?

"A. It was two months later, I think.

"Q. And at that time did you tell the police everything you knew about this?

"A. I don't remember telling them too much about it because I had a terrible attack of this at the time of my arrest.

"Q. What, sir?

"A. I had a—I fell out at the time. I don't remember telling them too much. I don't really know what he asked me at that time.

"Q. You stated that you have blackout spells. Do you know how long you have had those?

"A. Well, from, I think '54 or '55. I was working at Lake Barcroft, Virginia.

"Q. No. At the time this all happened on April 12 of last year, were you employed, sir? Were you working?

"A. Certainly.

"Q. Where were you working?

"A. For a construction company.

\* \* \* \* \* \*

"Q. Since 1954 or 1955, did you ever have—had you ever been involved in any automobile accidents?

"A. I have.

"Q. And when was that?

"A. I don't know the exact time. I had a couple of accidents right behind each other because of these same procedures. I had one of those spells and ran into the back of a man's car and that was a couple of years ago. I don't know the exact date.

"Q. How many accidents have you had since 1954 or 1955?

"A. Oh, I don't know. Just two I know of, two.

"Q. In any of them were you seriously injured?

"A. No, I don't drive that fast because I understand that I have them.

"THE COURT: Do you still have your permit?

"THE WITNESS: No, sir.

\*    \*    \*    \*    \*    \*

"THE COURT [Out of the hearing of the jury]: Do you want to say anything about the permit being revoked?

"MR. KAY [Defense Counsel]: I don't know.

"THE COURT: I won't go into it then.

\*    \*    \*    \*    \*    \*

"Q. Why didn't you come back to Washington where you job was and your family?

\*    \*    \*    \*    \*    \*

"A. I was sick. At the time I got to New York I was sick. I had to go to the doctor immediately.

\*    \*    \*    \*    \*    \*

"A. They were treating me for the symptoms and these spells and heart trouble at the same time.

"Q. What was the name of the doctor?

"A. I don't know the exact name.

"Q. What hospital?

"A. It wasn't a hospital. It was a private doctor.

"Q. What was the address?

"A. I don't know the—it was Red Banks, New Jersey.

"Q. Had you ever gone to a doctor down here for these spells?

"A. That's right.

"Q. What doctor did you go to down here?

"A. Casualty Hospital.

\*    \*    \*    \*    \*    \*

"Q. Do you know of any piece of written document anywhere that would attest to the fact that you maintained that you had these black-out spells over the past four or five years?

"A. Yes.

"Q. Where?

"A. At the time I was arrested in two places, in Virginia and in the District and I suffered with these spells and a number of people had seen me actually have these spells and at the time I didn't even know I had them.

\*    \*    \*    \*    \*    \*

"A. \*  \*  \* These spells come from overheated, over strained. My type of work is awful hard work.

"Q. Were you over heated the morning you cut your wife's throat?

"A. I couldn't say at that time because I was carrying an awful strain for my children. You see your little children crying for you and locked in the house some place and you can't do nothing for them.

"Q. Did you see them crying for you that particular morning?

"A. I certainly did.

\*    \*    \*    \*    \*    \*

"Q. Did you collapse on the street?

"A. A lot of times that I—

"THE COURT: The question was, did you collapse at this time, sir?

"THE WITNESS: I did later.

"By MR. MURPHY:

"Q. Did you fall unconscious on the street?

"A. I did at the lunch room. I fell completely out at the lunch room. I fell on the truck there.

"Q. This was before you came back to find out that the police were going to shoot you?

"A. That's right, before I come back.

"Q. Did you—

"A. Someone thought that I was dead.

"Q. Who thought you were dead? Name some of the persons.

"A. Well, I don't actually know all of them.

"Q. Just tell us some of them.

"A. Well, there was Ella B. I don't know the last names. He works for Terrell Construction Company. I don't know the last names because I really don't have no reason to ask them their last names."

The Government introduced testimony by Dr. Morris N. Platkin, Supervising Psychiatrist of the Maximum Security Division of St. Elizabeths Hospital. He testified that he had seen defendant at a medical staff conference and that it was the consensus of this conference that he was "without mental disorder." On cross examination he indicated that a variety of tests had been conducted to determine whether defendant was suffering from "epilepsy equivalent" and that they did not indicate that he was.[1] He explained epilepsy equivalent in the following terms:

"In certain types of patients instead of having the conventional epilepsy seizure which most people have heard about, people falling down and losing control of their bowels and bladder, in certain types of individuals they have periods when they become extremely disturbed. They don't fall down but they become extremely disturbed, very aggressive, very violent and perhaps destructive. This might last for five minutes and it might last for ten minutes or fifteen minutes. They come on rather abruptly and maybe over a period of a minute and they disappear in pretty much the same way and the patient is completely unaware of such an episode, completely unaware of what happened in that period of time."

When asked what methods are used by psychiatrists to determine epileptic equivalent, the doctor replied:

"One of the most important, of course, is the history. Almost invariably when an individual presents himself with this kind of problem he has a history of such episodes in the past and the history, of course, has to be confirmed by relatives, neighbors, friends, doctors who have examined him or other agencies or institutions or other witnesses of such episodes."

He proceeded to state that, although an electroencephalogram may sometimes be useful in detecting this disease, "it is possible that it might not reflect it" especially if its source was "deep seated in the brain or if it was between seizures."

The doctor was then asked whether epileptic equivalent was difficult to diagnose. He replied:

"No I don't think so. If they are well documented and if there had been several episodes and the description is given and they are fairly accurate, there is confirmatory evidence, they are pretty reliable but in the absence of that, you either have to make an assumption that it might be such an episode or wait until further development and keep the individual under close observation."

Later in his testimony he reiterated this theme as follows:

"One [episode] certainly would not be an adequate basis for making such a diagnosis because in a period of five or ten or fifteen minutes when a person becomes extremely disturbed and assaultive and destructive, could occur on the basis of anything. An individual could be drunk, he can be irritated, toxic and he can be angry about something and it could occur for numerous reasons but when there are series of such episodes and no

1. The tests revealed, *inter alia*, borderline intelligence, "some evidence of emotional inability [*sic*] and some very, very questionable evidence that there might be

some organic brain changes." The diagnosis therefore "was not that there was no epileptic equivalent" but rather "that it was within normal limits."

basis for them and other factors ruled out, when all of these are ruled out, then there is strong presumptive evidence that he is suffering from an epileptic equivalent. One can never be absolutely one hundred per cent certain unless there is a long recorded history, unless these occurred many times and reliable witnesses have seen them and perhaps you have confirmatory evidence * * * or a well recorded history * * *, and in the absence of anything like that, the best you can do is make a presumption."

It is clear from these statements and similar ones throughout the psychiatrist's testimony that no trustworthy conclusion regarding the presence or absence of "epileptic equivalent" could be reached, in the context of this case, without a thorough-going investigation to determine whether defendant had, as he claimed, a history of blackouts with loss of memory. There is nothing in the record, however, indicating whether any such investigation was ever conducted on behalf of this indigent defendant of "borderline intelligence," [2] either by court-appointed counsel, by St. Elizabeths Hospital, or by the Government.[3] We do not know, for example, whether the 1959 report of the

Legal Psychiatric Services, which purportedly confirmed defendant's claims, was ever examined; whether there was a search for accident or permit revocation reports to confirm defendant's claim that he had blacked out while driving and had run into a number of cars; whether the records of the construction company in Lake Barcroft, Virginia, contains any reference to blackouts; whether the records of Casualty Hospital contain any reference to blackouts; whether there are arrest records in Virginia or the District which contain references, as defendant claims they do, to the fact that a number of people had seen him have these spells; or whether any effort was made to locate Ella B., who allegedly works for the Terrell Construction Company and witnessed a spell on the day of the crime.

Since the interests of justice plainly required some such investigation, and since the record provides no adequate assurance that one was conducted,[4] I cannot vote to affirm the conviction. I would remand the case for a determination whether there was an investigation. If there was not, one should be ordered. And if such an investigation discloses evidence of a history of blackouts, a new trial should be granted.

2. See note 1 supra.

3. If defense counsel had conducted such an investigation and found nothing to support appellant's story, we would not expect this to appear in the record. The same, however, cannot be said in reference to St. Elizabeths Hospital or the prosecution.

4. It has been repeatedly pointed out that in situations of this type, "inadequacy of the evidence is not a point in favor of the prosecution." Williams v. United States, 102 U.S.App.D.C. 51, 55–56, 250 F.2d 19, 23–24 (1957); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 849 (1962); Brennan, Law and Psychiatry Must Join in Defending Mentally Ill Criminals, 49 A.B.A.J. 239, 242 (1963).