Albert Houston CARTER, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19627.

United States Court of Appeals
Fifth Circuit.

Dec. 30, 1963.

698

Hewitt H. Covington, Erwin H. Baumer, John L. Moore, Jr., Atlanta, Ga., for appellant.

Truett Smith, Asst. U. S. Atty., Macon, Ga., Robert S. Erdahl, Atty., Dept of Justice, Washington, D. C., Floyd M. Buford, U. S. Atty., Macon, Ga., for appellee.

Before TUTTLE, Chief Judge, and RIVES, CAMERON, JONES, BROWN, WISDOM, GEWIN and BELL, Circuit Judges, En Banc.

PER CURIAM:

The judgment is AFFIRMED by an equally divided Court. See Rice v. Sioux City Cemetery, 1954, 348 U.S. 880, 75 S.Ct. 122, 99 L.Ed. 693, on rehearing, 1955, 349 U.S. 70, 73, 75 S.Ct. 614, 99 L.Ed. 897, 5 Am.Jur.2d, Appeal and Error, § 902, pp. 338, 339.

Affirmed.

RIVES, CAMERON and GEWIN, Circuit Judges, concur.

JONES, Circuit Judge, concurs specially.

TUTTLE, BELL, BROWN and WISDOM, Circuit Judges, dissent.

JONES, Circuit Judge (concurring specially):

The scriptural lament that "Of making many books there is no end," [1] might be revised to include judicial opinions. I think this Court might well follow the example of the Supreme Court in its undeviating practice of giving no indication regarding the grounds of its division where an appeal is decided by a divided court.[2] It has been assumed by me that the purposes of a judicial opinion, unless it be in dissent, are to inform the losing litigant as to the reason why he has lost his case, and to set forth and publish the governing legal principles so that they might become precedents for future decisions. The use of judicial precedents and the application of the doctrine of stare decisis are characteristic of Anglo-American law which distinguishes it from Roman law.[3] The use of precedents is older than the Year Books.[4] I cannot see how the judges of this Court are contributing to the law's development by writing opinions in this cause where their equal division has resulted in an affirmance. We have not here made a decision. We have not here established a precedent. It seems to me to be rather presumptuous to say or suggest to the Supreme Court, as I think is being done, that because we are divided it should take jurisdiction.

GRIFFIN B. BELL, Circuit Judge, with whom TUTTLE, Chief Judge, and JOHN R. BROWN and WISDOM, Circuit Judges, join, dissenting:

We respectfully dissent. Albert Houston Carter was indicted for causing a forged check to be transported in interstate commerce in violation of 18 U.S.C.A. § 2314. He was also indicted for perjury allegedly occurring in a hearing before the United States Commissioner on the check offense. Title 18 U.S.C.A.

1. Ecclesiastes 12:12.

2. Rice v. Sioux City Memorial Park Cemetery, 349 U.S. 70, 73, 75 S.Ct. 614, 99 L.Ed. 897.

3. Llewellyn, The Common Law Tradition, Deciding Appeals, pp. 26 et seq.; Radin, Anglo-American History, pp. 343 et seq.; Salmond Jurisprudence, 6th Ed. pp. 159 et seq.

4. Holdsworth, The Year Books, 2 Select Essays in Anglo-American Legal History, pp. 110 et seq.

§ 1621.[1] He was a captain in the United States Air Force at the time of these occurrences. The trial in April 1962 resulted in a jury verdict of guilty on the perjury charge, and a mistrial on the check charge, the jury being unable to agree as to it. This appeal is from the judgment on the perjury conviction.

The alleged forgery took place on August 8, 1960 and the perjury on October 3, 1960. The indictments were returned in August 1961. The jury was unable to agree as to either charge on a previous trial in October 1961, and a mistrial resulted on both charges. The principal defense was insanity, and because of the resulting question of the proper assessment of criminal responsibility, this court, after arguments before a regular panel, ordered en banc consideration of the case, *sua sponte*, with further arguments.

## I.

Appellant enlisted in the Air Force in May 1948 and served until 1953 as an enlisted man. In September of that year, after having attended officers candidate school, he was commissioned a second lieutenant, and entered active duty as an officer. He remained on active duty as an officer, serving as a navigator and bombardier, from then until he was involuntarily discharged on December 29, 1960. He was promoted to the rank of captain on January 1, 1960.

He was rated as excellent on his officer effectiveness report for the period February-August, 1959. It was there stated that he was leading the wing in navigation competition and was near the top in bombing, and that he was exceptionally well qualified for promotion. He was then serving as a first lieutenant and member of a B-47 aircraft crew, and was being transferred to a B-52 crew. The report pointed out that he was a non-regular officer and recommended him for regular status. His squadron commander concurred in the report, prepared by the aircraft commander, and said that appellant:

"* * * has continually produced excellent to outstanding results. His mind is keenly analytical and he is constantly searching for means to producing higher quality performance. Only a personal family problem concerning his wife's health has influenced my approval for his transfer; his circular error in bombing and navigation has been among the best in the Wing and I anticipate that it will continue in the B-52 aircraft. My rating is based on daily observance of his performance."

This report is dated August 4, 1959. It was suggested that he be utilized as an instructor for a reasonable time in his new assignment, and that he then be transferred to staff work where his ability could best be put to use.

His difficulties appear to have occurred shortly after his promotion to captain. In the same month, January 1960, he was transferred to Turner Air Force Base, Albany, Georgia. He was there accused by the base commander of having failed to pay a motel bill, and placed under arrest. The charge was dropped. His contentions that he was stigmatized by the charge and arrest, and that he was subject to severe harassment from that time forward were not disputed. The record also indicates that he was mentally disturbed during this period, which includes the dates in question, having difficulty sleeping and suffering nightmares and bedwetting.

On August 8, 1960, the date of the check offense, he had a charge account with Sears Roebuck & Company in good standing, and his finances were otherwise in order. He owned various work shop

[1]. "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, * * *."

tools. Nevertheless, he appeared at the Sears store in Macon, Georgia; purchased tools of a type already owned by him, and paid for them with a check in the amount of eighty eight dollars and thirty nine cents drawn on the account of another in a Texas bank without that person's authority. He then went to another department in the store and attempted to purchase a transistor radio with a check of the same type. He became suspect when store officials were unable to verify his representation of residence at Warner Robins, Georgia, and the radio transaction was not consummated. The store personnel in charge suggested that they give him back the check for the tools, and that he, in turn, give back the tools. While this was in process, appellant fled the scene. He stored the tools in a warehouse in Albany, Georgia under still another name, and never withdrew them from storage. His position on the trial was that he had no recollection whatsoever of these occurrences. There was a transaction somewhat similar in nature at the Sears store in Columbus, Georgia on August 19, and evidence as to it was admitted to bolster the proof of fraudulent intent on the check offense.

On October 3, 1960, appellant was brought before the United States Commissioner in Albany, Georgia for hearing to determine probable cause as to the check offense. He took the stand and testified that he was flying on board an aircraft at the time the witnesses stated that he had appeared in the Sears store in Macon. His testimony was based on a flight record which he had obtained from the Air Force and to which, sometimes previously, he had added his name as having been on board the plane. It was clear that he limited his position to the record, and was not testifying as a matter of independent recollection. On the trial he testified that he added his name to the record in order to justify flight pay, which at the time of the entry was being questioned, and that he was perhaps confused with a flight that he took four days earlier. He stated, in

response to whether he falsified the flight record, that he did not know, but that he would not be surprised as to what he may have done during that period of time.

On October 7, 1960, four days after the testimony before the Commissioner, the Air Force ordered that Captain Carter be hospitalized for psychiatric observation and diagnosis, and he was taken to the Air Force hospital at Elgin Air Force Base, Florida for that purpose. The official clinical record shows the following diagnosis, and it coincided with the testimony of the Air Force psychiatrist at the trial:

"Passive—aggressive reaction, severe chronic, manifested by difficulty in recognizing angry feelings within himself, coupled with impulses toward anti-social acts in an attempt to discharge these feelings."

He remained in that hospital for a period of four weeks, and was then put in solitary confinement at Fort Benning, Georgia, and elsewhere for fifty two days. He received some additional psychiatric treatment during this period. He also committed a severe act of self-mutilation upon himself with a razor blade while at Fort Benning. Following his involuntary discharge from the Air Force, and his subsequent indictment, he was given a psychiatric examination at the Atlanta Federal Penitentiary pursuant to the direction of the trial court, pending trial. He was in the psychiatric ward there for approximately four months. During this period he wrote several letters to such people as the President of the United States and the Governor of Georgia which were unusual in their content to say the least.

Appellant was ably defended on the trial by appointed counsel. They sought to broaden the defense of insanity to such dimension as the trial court might agree within the range of the rule in this circuit, Howard v. United States, 5 Cir., 1956, 232 F.2d 274, and that of Durham v. United States, 1954, 94 U.S. App.D.C. 228, 214 F.2d 862, 45 A.L.R. 2d 1430. They preferred the rule of

Durham rather than that of Howard but, while offering their own suggestions, in effect attempted to put the burden on the court to formulate a rule applicable to the facts of the case. This was not an extraordinary position in a case involving a defense of insanity where counsel and the court are assiduous in their efforts to accord appellant due process of law under the circumstances. Cf. Fitts v. United States, 10 Cir., 1960, 284 F.2d 109, by way of analogy.

The Air Force psychiatrist testified that appellant at the time of his examination at Eglin Air Force Base hospital suffered from a mental abnormality. He was asked whether the acts charged could have been the product of that mental abnormality. His response was that the charges were importantly related to the fact that he had a character and behavior disorder. He stated that he did not know just what the word "product" meant, but that he regarded appellant as being mentally sick, and thought at the time of his examination that he was incapacitated for military duty. He advised appellant that he needed psychiatric treatment, and how it would alleviate his disorder. He stated that his diagnosis was that the aggressive and impulsive anti-social things that appellant had done or had impulses to do represented a way he had of dealing with feelings that were not conscious in him. He also had felt that appellant had paranoid tendencies, and displayed some manic-depressive trends. He put the self-mutilation incident in this latter category when it was called to his attention.

This psychiatrist, the only expert testifying, gave as his opinion that appellant could distinguish right from wrong with respect to the check offense on August 8, 1960, and could adhere to the right. His opinion was that appellant could distinguish right from wrong on the perjury date, October 3, 1960, but he was not asked whether appellant could adhere to the right on that date, and gave no opinion in this regard.

Coupled with this testimony, and the foregoing facts regarding appellant's mental condition at or near the dates of the offenses involved, was this additional important fact. Appellant testified that on one occasion in Houston, while awaiting trial, he stole an article from a store but sneaked it back into the store within a few hours when it dawned on him what he had done. He stated that his action in stealing on this occasion was the result of an impulse, something not again experienced within recent months before the trial.

The court charged the burden of proof rule with respect to sanity set out in Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499; and the basic definition or standard of insanity set out in Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750, and followed in Howard, supra.[2]

2. The charge in pertinent part, (with paragraph numbers added for convenience) was:

"Now with respect to the matter of insanity, Members of the Jury, I charge you that insanity is a valid defense, and under our law a person charged with an offense who is insane at the time of the offense charged is not guilty, and would not be guilty by reason of insanity.

＊　＊　＊　＊　＊

■ "Now we come more specifically to what is meant by insanity. The term insanity as used in this case means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing; or where, though conscious of it and able to distinguish between right and wrong and know that the act is wrong, yet his will, by which the law means the governing power of his mind, has been otherwise than voluntary so completely destroyed that his actions are not subject to it but are beyond his control.

■ "To state it differently, the accused should not be regarded as criminally responsible where because of his mental defect or disease, if you find he has any, he either cannot distinguish right from wrong, that is does not know the difference between right and wrong, or, if able to make the distinction, cannot

## II.

The assignments of error are, first, that the verdict was not supported by the evidence in that the government failed to prove the requisite criminal intent beyond a reasonable doubt in view of the hypothesis of insanity; second, that the charge to the jury as it related to the crime of perjury was incomplete and confusing on the question of criminal intent; and third, that the charge was inadequate with respect to the question of criminal responsibility as related to the assertion of insanity and the relevant facts.

We have carefully considered the first and second assignments of error and find them to be without merit. This appeal involves only the crime of perjury. The burden was on the prosecution, under the facts adduced on the trial, and these facts included ample evidence to establish a hypothesis of insanity, to prove beyond a reasonable doubt that appellant was sane at the time of the commission of the crime, and was thus possessed of the requisite criminal intent. The evidence in this connection was sufficient to make a jury question. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, supra; Dusky v. United States, 8 Cir., 1959, 271 F.2d 385, reversed on other grounds, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824. Reasonable men would not necessarily possess a reasonable doubt as to the sanity of appellant when considered in the context of the facts having to do with the perjury charge, including appellant's own testimony before the commissioner. United States v. Westerhausen, 7 Cir., 1960, 283 F.2d 844. And compare the facts of Howard v. United States, 5 Cir., 1956, 229 F.2d 602, affirmance vacated and conviction reversed on errors in the charge, 232 F.2d 274, cited supra.

We think that the charge on the issue of perjury was adequate. It met the standard of Beckanstin v. United States, 5 Cir., 1956, 232 F.2d 1:

"* * * in order to constitute perjury, a false statement must be made with criminal intent, that is, with intent to deceive, and must be wilfully, deliberately, knowingly and corruptly false."

See also Harrell v. United States, 5 Cir., 1955, 220 F.2d 516; and 3 Wharton's Criminal Law and Procedure, (Anderson Ed.), §§ 1291–1293. The essential elements of the crime of perjury under 18 U.S.C.A. § 1621, including the element of a false statement wilfully made as to a material fact, were given in charge as prerequisites to a finding of guilt. United States v. Debrow, 1953, 346 U.S. 374,

choose between them, that is, is unable to refrain from doing wrong.

■ "You will see that there are two conditions, either one of which, if it exists at the time of the offense, if the offense was committed, would make the defendant not guilty by reason of insanity. First, if, by reason of a perverted and deranged condition of the mental and moral faculties, he is incapable of distinguishing right from wrong; and, second even though he can distinguish right from wrong, yet if, at the time of the commission of the act, as the result of some mental defect or disease, the defendant was unable to choose between right and wrong, that is was unable to refrain from doing wrong. Those are the two conditions.

■ "Either of these two conditions existing at the time of the commission of the act, and existing as the result of some mental defect or disease, would be sufficient to make the defendnat not guilty by reason of insanity. It is not necessary that both of these conditions exist to make the defendant not guilty, but if neither of these two conditions existed at the time of the commission of the acts, if they were committed, the defense of insanity must fail.

"I charge you further that temporary insanity, as well as insanity of longer duration, is recognized by the law.

"If, from all of the evidence in the case, the jury has a reasonable doubt whether the defendant was sane at the time of the alleged offense he should be acquitted, even though it appears he was sane at earlier and later times.

"And what I have said with reference to insanity, of course, applies equally to the two charges in this case, one alleged to have occurred on August 8, 1960 and the other alleged to have occurred on October 3, 1960."

74 S.Ct. 113, 98 L.Ed. 92. The portion of the charge on the check offense and the essential elements of that crime, including the element of intent set out in the statute and alleged in the indictment, could not reasonably have been confused with the charge on perjury.

We would, however, reverse and remand on the third assignment of error. On balance, we do not believe that the charge on the defense of insanity was adequately adjusted to the peculiar facts and posture of this case.

### III.

The hypothesis upon which the defense of insanity rested has been recited. Moreover, it must be related to one trial for two separate offenses, occurring some weeks apart. Appellant could not recall his actions in connection with the check offense. His contention was of something in the nature of amnesia, or that his action was the result of the subconscious mind. His contention with reference to the perjury charge, while based somewhat on the same factors, differed materially in degree. He remembered all about the hearing before the commissioner and his testimony there. But that testimony, forming as it does the subject matter of the perjury, was based on a flight record to which he had theretofore added his name as a member of the crew. His testimony was not based on his recollection. According to the record, he stated; he was on an aircraft when he was said to be in Macon. The perjury in effect consisted of relying upon a record known to be false. His defense on the trial was that he added his name to the record in an effort to clear up a question with respect to his flight pay, and that he possibly had the date confused with a flight that he was on four days earlier. He thought the record was accurate because it had not been questioned. When asked whether he falsified the flight record, he responded:

"Not that I know of. Although I will be frank with you, I wouldn't be surprised what I did during that period of time."

The jury might have believed, in the background of the evidence including appellant's action in the case of the check, that the perjury offense resulted from a condition of subconsciousness, or lack of consciousness with a substitution of impulse for will both at the time he added his name to the record, and when he relied on the record at the hearing before the commissioner. The right and wrong test and the test of ability to refrain from doing wrong were applicable on both occasions, but lack of consciousness was an equally applicable test under the basic charge given. The charge however, placed much more emphasis on the first two tests. See Footnote 2, supra, paragraphs numbered [1], [2], and [3]. Consciousness was mentioned in the basic Davis definition, (par. [1]), but was dropped in the amplification by the court which restricted the standard to knowing the difference between right and wrong and the inability to refrain from doing wrong. (par. [2] and [3]). Having once charged on consciousness, it should have been given equal emphasis under the facts of this case.

Furthermore, the absence of expert testimony that appellant could adhere to the right as related to the perjury offense bolsters our belief that the whole charge on insanity did not fairly put the issue to the jury for their determination. This was not a fatal absence in view of the other facts, but it is a vital factor when it is remembered that there was such testimony as to the check offense, and in the light of the contention of subconscious acts. It was all the more reason to give a carefully adjusted charge.

The basic Davis definition of the term insanity given was taken from the second Davis case, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750, supra.

"The term 'insanity' as used in this defence means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or where,

though conscious of it and able to distinguish between right and wrong and know that the act is wrong, yet his will, by which I mean the governing power of his mind, has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control."

We adhered to it in the second Howard case, 232 F.2d 274, supra. We reaffirm our holding there in this respect, but we have not said and this is not to say that its language is exclusive, or the end-all. Davis by no means teaches this. That definition poses the question in the context of cognition and volition, but in general catch-all language. Something more than stereotype may be needed to bring home to jurors that degree of latitude necessarily vested in them if evidence regarding mental abnormality as related to a defense of insanity is to be fairly considered. But here the court departed from the stereotype in a case where it would have been adequate.[3]

## IV.

Three fundamental principles of law are usually brought into play where the defense of insanity is made in the federal courts. The first is concerned with burden of proof.

The charge in this respect accorded with the rule of the first Davis case, Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, supra:

"Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defence is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question

from the time a plea of not guilty is entered until the return of the verdict, is whether upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt that hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offence charged."

It follows also from the teaching of this case that if there is some evidence supporting the claim of insanity, something not disputed here, the issue must be submitted to the jury. This means only slight evidence. Lee v. United States, 5 Cir., 1937, 91 F.2d 326; Howard, supra; Hall v. United States, 4 Cir., 1961, 295 F.2d 26. This question of sufficiency, as is true of the question of taking the case from the jury where as a matter of law there is reasonable doubt as to a defendant's sanity, is for the court. Fitts v. United States, supra; United States v. Westerhausen, supra.

The next principle is to admit all evidence, both lay and expert, in anywise relevant or pertinent, to the issue of insanity; letting in as it were, all raw material from which the jury is to make the final determination of the criminal responsibility of the accused. United States v. Currens, 3 Cir., 1961, 290 F.2d 751. The scope of the contribution of the psychiatrist is to describe "all the dimensions of the defendant's capacity, his competence and ability to control and regulate conduct and behavior." Blocker v. United States, 1960, 110 U.S.App.D.C. 41, 288 F.2d 853, at p. 868, concurring opinion of Judge Burger. This liberal rule of admissibility was followed in this case.

We come then to the third principle; the one that forms the basis of what we deem to be error here. Within the framework of the burden of proof rule, and upon the evidence adduced, assuming, as

3. The charge on temporary insanity was proper and sufficient. See Footnote (2).

was the case here, at least slight evidence of insanity and no such reasonable doubt of sanity as would require the court to acquit, it becomes the duty of the trial court to give the jury a standard by which the issue of not guilty by reason of insanity may be determined. In substance, that standard should concern itself with whether defendant understood and appreciated the act in question and its consequences, and whether it was a result of a free exercise of will or choice.[4]

The definition of insanity in the second Davis case consisted of the right and wrong test, and what is commonly called the irresistible impulse test. The right and wrong test, prevailing in most jurisdictions in this country, rests on the proposition of cognition, that a defendant is not deemed to be criminally responsible if he does not know the nature of his act, or the difference between right and wrong with respect to that act. This rule has its modern origin in McNaghten's Rule, 1843, 10 Cl. and F. 200, 210; 8 Eng.Rep. 718, 722 where the House of Lords, in response to questions propounded, stated:

> " * * * to establish a defense on the ground of insanity it must be clearly proved that at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong."

Many jurisdictions have added the so-called irresistible impulse test to the right and wrong test, just as was the case in Davis. It rests on the proposition of volition. It is perhaps a misnomer because it includes acts resulting from premeditation as well as from sudden impulse, but it is applicable when one understands the nature and consequences of his act and appreciates the wrongness of the act, but, in consequence of a mental abnormality, is forced to its execution by an impulse which he is powerless to control.

Another and different standard was laid down in State v. Pike, N.H., 1870, 49 N.H. 399. It was that an accused is not criminally responsible "if the unlawful act was offspring or product of mental disease."[5]

The Court of Appeals for the District of Columbia in Durham, supra, adopted a standard, not unlike the New Hampshire rule in Pike, that "an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." This holding set off a national juridical discourse on the subject. That circuit had theretofore followed the right and wrong test, plus irresistible impulse. No court has adopted the new test or rule although many have considered and rejected it. See concurring opinion of Judge Burger in Blocker, supra, 288 F.2d p. 866, Footnote 22. Included among this group is this court in Howard, supra, as well as other federal courts. See Currens, supra; Voss v. United States, 8 Cir., 1958, 259 F.2d 699; Dusky v. United States, 8 Cir., 1959, 271 F.2d 385, reversed on other grounds, 362 U.S. 402, 80 S.Ct. 688, 4 L.Ed.2d 824; Dusky v. United States, 8 Cir., 1961, 295 F.2d 743, cert. den., 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536; Fequer v. United States, 8 Cir., 1962, 302 F.2d 214, cert. den., 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d

4. For excellent histories of basic standards as well as references to apt medical comments, see Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862; United States v. Currens, 3 Cir., 1961, 290 F.2d 751; and Blocker v. United States, 1961, 110 U.S.App.D.C. 41, 288 F.2d beginning at pp. 853, 857, concurring opinion of Judge Burger. See also 1 Wharton's Criminal Law and Procedure (Anderson Ed.), §§ 38, 39 and 42.

5. This rule was modified in State v. Jones, 1871, 50 N.H. 369, by adding the following:

> "If the defendant had an insane impulse to kill his wife, which he could not control, then mental disease produced the act. If he could have controlled it, then his will must have assented to the act, and it was not caused by the disease, but by the concurrence of his will, and was therefore crime."

110; Anderson v. United States, 9 Cir., 1956, 237 F.2d 118; and Sauer v. United States, 9 Cir., 1957, 241 F.2d 640, cert. den., 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed. 2d 1539.

It is worthy of note that Pike has only been followed by Durham, and Durham has now been modified by McDonald v. United States, 1962, 114 U.S.App.D.C. 120, 312 F.2d 847. There the terms mental disease and mental defect as used in the Durham rule are defined as including any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. The court makes it plain that in determining criminal responsibility, the question of whether a defendant has a disease or defect is to be determined by the jury from all the testimony, lay and expert, and not by what the experts may think for clinical purposes. Additionally, the court authorized a charge to the jury that capacity to distinguish right from wrong, and the ability to refrain from doing a wrong or unlawful act may be taken into consideration as factors by the jury in deciding whether the act charged was the product of mental disease or mental defect.

In the meantime, Currens had been decided by the Third Circuit. Durham was rejected as was the McNaghten rule plus irresistible impulse. The court adopted the following rule which seems to merge the elements of cognition and volition, and we use the term volition as including the element of capacity to control behavior. The premise of the court was based on the concept of *mens rea;* that a person does not possess the necessary guilty mind to be guilty of a crime where there is reasonable doubt of capacity of choice and control.

"The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated."

One of the better statements of the standard to be followed by a jury in determining the issue of insanity and one close to the Davis rule is contained in the case of Parsons v. State, 1887, 81 Ala. 577, 2 So. 854, 866:

"* * * the inquiries to be submitted to the jury, then, in every criminal trial where the defense of insanity is interposed, are these: *First.* Was the defendant at the time of the commission of the alleged crime, as a matter of fact, afflicted with a *disease of the mind,* so as to be either idiotic, or otherwise insane? *Second.* If such be the case, did he know right from wrong, as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible. *Third.* If he did have such knowledge, he may nevertheless not be legally responsible if the two following conditions concur: (1) If, by reason of the duress of such mental disease, he had so far lost the *power to choose* between the right and wrong, and to avoid doing the act in question, as that his free agency was at the time destroyed; (2) and if, at the same time, the alleged crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it *solely.*"

The American Law Institute rule[6] is as follows:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. (§ 4.01(1) of the American

---

6. § 4.02 of the rule provides that the terms mental disease or defect do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

Law Institute Penal Code, Proposed Official Draft, 1962)

By way of summary, we think that the rules of Davis, Parsons and the American Law Institute all embrace cognition, the intellectual process of recognizing the difference between right and wrong; and volition, the act of willing or choosing which includes the capacity to control one's behavior. These rules may be used interchangeably if adjusted to the facts. In some cases, depending on the facts, one may be more apt than the other, but these three or any other rule which conveys the sense of these three to the jury in charge where there are applicable facts will be sufficient. Cf. Dusky v. United States, 8 Cir., 295 F.2d 743.

Our view on the question of admissibility of evidence and on the standard to be given the jury in charge substantially accords with the position of the government expressed as follows in its brief:

> " * * * whether a standard of criminal responsibility provides a workable and meaningful modern test depends upon its satisfying two basic criteria: First, it should permit the expert witness to utilize in his testimony the entire fund of psychiatric learning as this body of knowledge deepens and expands and is pertinent to the mental condition of the accused as it relates to the act for which he is on trial, and, as far as possible, to convey his expertise to the jury in terminology which it can understand and apply. Second, it should afford the jury a meaningful explanation of the criteria it is to apply in evaluating the evidence as to the accused's mental condition and in deciding the answer to the ultimate question whether he committed the acts with which he is charged freely, purposefully and with a guilty mind * * * these criteria

should include the questions whether he appreciated the nature of the act and its consequences, and whether he had the will and capacity to refrain from doing it."

Having determined the charge on insanity to be error, our conclusion under the reasoning of Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, is one of grave doubt with respect to whether the error had substantial influence on the outcome of the case. It was thus harmful, and we would reverse and remand so that appellant might be afforded a new trial consistent with the views herein expressed.[7]

JOHN R. BROWN, Circuit Judge, with whom Judge WISDOM joins, concurring specially in Judge GRIFFIN B. BELL'S dissenting opinion:

I join in Judge BELL'S dissenting opinion, but I would not stop there.

It is time—and when the Court voted to hear the case en banc, I suppose that all of us thought this would be the time— for the full Court to give critical review to this important problem of federal criminal law. But an inability to muster a majority out of the Judges sitting has again postponed this day. Perhaps offsetting the awesome consequence that this particular appellant has something substantively less than the appeal as a matter of right which 28 U.S.C.A. § 1291; F.R.Crim.P. 37, affords him, is the possibility that this impasse will, in part, impel acceptance of this case for review by the Supreme Court. There are many experienced in this field as lawyers, as teachers, and District Judges on the firing line who think that the 66 years since 1897[1] is long enough to warrant a second, if not a new, look at this pressing recurring problem.

It is absurd to keep talking about McNaghten. McNaghten is dead. So,

7. The entire court expresses its appreciation to appointed counsel for their services in the highest tradition of the profession in this matter.

1. This was last dealt with in the two Davis cases. Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 453, 40 L.Ed. 499; and Davis v. United States, 1897, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750.

too, is Durham.[2]  Just what is left of Howard,[3] I am not so sure.  Probably it is not really a distinctive rule at all for what it did was merely fall back on Davis (note 1, supra) and other ancient cases including Parsons.[4]

These opinions suffer from the inescapable fact that they represent the law's effort to write concerning medico-legal concepts about which the world then knew little.  In thus criticizing these cases because from another vintage I do not subscribe to the misapprehension held by some that contemporary law always looks with disfavor on ancient principles.  But it is difficult for me to see how law lives up to its ideals when it rests its rule on things said or written at a time when so little was known about behavioral science.  Though Durham (see note 2, supra) has now been discarded, I do not share the view that this was a meaningless interlude.  Rather, it proves the wisdom of law in its effort to adapt itself to an ever-expanding sum of knowledge, whether scientific or otherwise.  A rule was formulated and then tested in the hot fire of experience.  It was found wanting.  But the need for constant concern whether law is abreast of accepted learning was not thereby proved to be lacking.

The great value of Judge Bell's opinion, overshadowing any minor criticisms of the kind discussed above (note 4, supra) is the need for great flexibility in the nature and scope of evidence admitted and in the legal standards as the Judge translates them into effective instructions for jury application in the context of a given case.  All of this would be aided were we to write these standards in understandable English in the light of contemporary scientific knowledge and, equally important, the knowledge wrought by the law's efforts to attain a sound goal reconciling the demands for a secure society with the natural revulsion to the idea that human beings are to be criminally punished for that which they did not really responsibly do.  A big step in that direction is to emphasize that we should quit talking in terms of McNaghten, Davis, Durham, Howard, Parsons, or the rest.

2.  McDonald v. United States, 1962, 114 U.S.App.D.C. 120, 312 F.2d 847, and see the numerous cases subsequent to McDonald: Williams v. United States, D.C. Cir., 1962, 312 F.2d 862; Hawkins v. United States, 1962, 114 U.S.App.D.C. 44, 310 F.2d 849; Alexander v. United States, 1963, 315 U.S.App.D.C. 486, 318 F.2d 274; Mitchell v. United States, 1963, 114 U.S.App.D.C. 353, 316 F.2d 354; Strickland v. United States, D.C.Cir., 1963, 316 F.2d 656; Horton v. United States, D.C.Cir., 1963, 317 F.2d 595; Gray v. United States, D.C.Cir., 1963, 319 F.2d 725; Blocker v. United States, D.C. Cir., 1963, 320 F.2d 800; Simpson v. United States, D.C.Cir., 1963, 320 F.2d 803.

3.  Howard v. United States, 5 Cir., 1956, 232 F.2d 274 (earlier decision 1956, 229 F.2d 602).

4.  Parsons v. State, 1887, 81 Ala. 577, 2 So. 854.  To this extent I really cannot subscribe to Judge Bell's statement that "[o]ne of the better statements of the standard to be followed" is the quotation then made from the Parsons opinion. The Alabama Supreme Court lays down rules "first," "second," and "third."  If the "first" really existed—the defendant was "either *idiotic* or otherwise *insane*," —it would shock us all today to think he was nevertheless criminally accountable even though as in "second," he did "know right from wrong."  Worse is the mandatory conjunction of sub conditions (1) and (2) under "third."  Thus to a condition of (1) that by reason of the mental disease the defendant "had so far *lost* the *power* to *choose* * * * and to avoid doing the act in question [so] that his *free agency was* at the time *destroyed*" the rule lays down the further condition (2) that the crime was "the product * * * *solely* * * *" of "such mental disease."  If, as condition (1) assumes, the power of choice was gone and free agency was destroyed, no civilized court in my judgment would hold the person criminally accountable.  To that extent condition (2) is superfluous. In any event, considering the complex nature of the human machine and the myriad of motivations which bring about human conduct, it is (in my opinion) nothing short of absurd for a court to ever demand, or hope to get credible proof on, the crime having been caused *solely* by "such mental disease."  (Emphasis supplied)